**WOMEN'S MEDICAL PROFES-
SIONAL CORPORATION,
et al., Plaintiffs,**

**v.**

**Bob TAFT, et al., Defendants.**

No. C–3–00–368.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 22, 2000.

Alphonse A. Gerhardstein, Cincinnati, OH, David C. Greer, Dayton, OH, Janet Crepps, New York, NY, for Plaintiffs.

Elizabeth L. Schuster, Karl Schedler, Columbus, OH, Greg Dunsky, Dayton, OH, for Defendants.

DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR PRE-LIMINARY INJUNCTION (DOC. # 2); DEFENDANTS, THEIR EM-PLOYEES, AGENTS, SERVANTS PRELIMINARILY ENJOINED FROM ENFORCING ANY PROVI-SION OF SUBSTITUTE HOUSE BILL 351, PENDING FINAL DECI-SION ON MERITS; CONFER-ENCE CALL SET FOR THURS-DAY, SEPTEMBER 28, 2000, AT 5:00 P.M., TO DETERMINE FUR-THER PROCEDURES TO BE FOL-LOWED IN THIS LITIGATION

RICE, Chief Judge.

On December 13, 1995, in an opinion preliminarily enjoining a prior attempt by the State of Ohio to prohibit a means of pregnancy termination known as Dilation and Extraction or "partial birth" abortion, this Court stated:

Never, since the final shot of the Civil War, over a century and a quarter ago, has American society been faced with an issue so polarizing and, at the same time, so totally incapable of either rational discussion or compromise, as is the ongoing controversy, of which this case is but the latest chapter, over the legality of attempts by the State to regulate abortion—the act of voluntarily terminating a pregnancy, prior to full term.

*Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051, 1056 (S.D.Ohio 1995) (Rice, J.).

Nothing that has ensued, in the almost five years that have elapsed since that observation, has lessened either the stridency of the arguments or the sincerity of those holding opposite, seemingly irreconcilable opinions on this issue. The issue presently before the Court is not whether pregnancy termination by the Dilation and Extraction method, commonly known as the partial birth abortion, is moral or otherwise, or whether the attempt to ban such a procedure is or is not good public policy. This Court's opinion on the morality of the procedure in question, or on the subject of pregnancy termination in general, is *not* relevant to its consideration of the facts presented or the applicable law. Nor is the Court's personal viewpoint on these issues of relevance to or of influence in the decision rendered in this matter. This Court does not sit as a super-legislative body to carry out its own agenda or the morality, the public policy or the will of the people. Rather, this Court's task is to determine whether Substitute House Bill 351 ("HB 351" or "the Act"), the State of Ohio's latest effort to ban this procedure, is in accord with our Constitution, as interpreted by the Supreme Court of the United States. For the reasons which follow, the Court concludes that the Plaintiffs have demonstrated a substantial likelihood that it is not.

The present case presents a facial challenge to the constitutionality of Ohio HB 351, which was to have become effective on August 18, 2000. The Plaintiffs are the Women's Medical Professional Corporation ("WMPC") and Dr. William Mudd Martin Haskell. The Defendants are Ohio Governor Bob Taft, Ohio Attorney General Betty Montgomery and Montgomery County (Ohio) Prosecutor Mathias H. Heck, Jr.

The Plaintiffs commenced the present litigation on July 27, 2000, by filing a Complaint for a Temporary Restraining Order ("TRO") and Preliminary Injunction (Doc. # 1). In their Complaint, the Plaintiffs seek to enjoin the Defendants from enforcing HB 351. With certain exceptions, which will be discussed, *infra*, HB 351 bans Ohio physicians from performing, or attempting to perform, an abortion procedure identified in the Act as the "partial birth procedure." The Plaintiffs contend that HB 351 is unconstitutional for a number of reasons. These arguments may be divided into four broad categories. *First*, the Plaintiffs contend that the Act imposes an unconstitutional "undue burden" on women seeking abortion services in Ohio. *Second*, they argue that the Act lacks an adequate exception for the health of a woman. *Third*, they contend that the Act is unconstitutionally vague. *Fourth*, they assert that the Act unconstitutionally permits third-party civil suits against physicians who violate its terms. The Court granted a ten-day TRO on August 17, 2000, prohibiting enforcement of the Act. (Doc. # 4). On September 1, 2000, the Court extended the TRO until Tuesday, September 19, 2000. (Doc. # 16). Thereafter, on September 18, 2000, the Court entered a final extension to noon on September 22, 2000. (Doc. # 31).

In connection with the Plaintiffs' request for injunctive relief, the Court held an oral and evidentiary hearing on September 5-6, 2000. During that proceeding, the Court heard testimony from two medical practitioners, Plaintiff Haskell and Ray Paschall, M.D., who testified as an expert witness for the Defendants. The Court also heard testimony from Barbara Brewer, a clinical psychologist who testified as an expert for the Plaintiffs. In addition, the Court admitted into evidence, by stipulation of the parties, testimony from several other individuals who did not attend the September 5-6, 2000, oral and evidentiary hearing. Those individuals include Rein Siiner, M.D., Paula Hillard, M.D., Mary Campbell, M.D., George Goler, M.D., Haynes Robinson, M.D., Raymond Gasser, M.D., Nancy Romer, M.D., Anthony Levatino, M.D., John Doe # 1, M.D., John Doe # 2, M.D., Jane Doe # 1, who was a patient of Plaintiff Haskell, and John Paulson, who is employed by the Ohio Department of Health. The parties have provided the Court with affidavits, declarations and/or deposition testimony from some of the foregoing individuals. Others testified before the Court in the 1995 case of *Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051 (S.D.Ohio 1995), which involved the same parties but somewhat different issues. The parties have stipulated to the Court's consideration of extensive excerpts from the testimony and exhibits presented in the 1995 case. The Court has so considered matters from that earlier litigation. Finally, the parties have fully briefed and argued the issues raised in connection with the Plaintiffs' challenge to the constitutionality of HB 351. The Court heard final arguments on the Plaintiffs' Motion for a Preliminary Injunction on September 12, 2000. Having reviewed the parties' respective arguments, the Court turns now to the Plaintiffs' Motion for a Preliminary Injunction.

█ As a threshold matter, the Court will briefly address three issues that have not been raised by the parties. *First*, the Court notes that it has federal question jurisdiction under 28 U.S.C. § 1331, because this action involves a federal constitutional challenge to a state statute. *Second*, the Court finds, and the Defendants have not disputed, that Plaintiff Haskell has standing to bring the present action on behalf of himself and his patients. Given that Plaintiff Haskell intends to continue

performing the "partial birth procedure" after HB 351 takes effect, he faces a direct risk of prosecution and, therefore, has standing to seek pre-enforcement review of the Act. *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In addition, "[g]iven the close relationship between Plaintiff Haskell and his patients, and given the obstacles which prevent pregnant women from challenging this statute, including a desire for privacy and the imminent mootness of their claims, he may also assert third-party standing and raise the rights of his patients." *Voinovich,* 911 F.Supp. at 1058 (citing *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion)). *Third,* based upon the record before it, the Court also concludes, and the Defendants have not disputed, that Plaintiff Haskell has standing to challenge the portion of HB 351 that imposes a post-viability ban on the performance of the "partial birth procedure." As the Court will explain more fully, *infra,* the question of whether a fetus is viable "is fraught with uncertainty and susceptible to being subsequently disputed by others." *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 205 (6th Cir.1997). Plaintiff Haskell has testified that he performs abortions through the twenty-fourth week of pregnancy. (Tr. 9–6–2000 at 56). On the record before it, the Court cannot say that the twenty-fourth week abortions performed by Plaintiff Haskell will fall outside the Act's definition of post-viability abortions. This is particularly true, given that HB 351 does not employ a presumptive date for the existence of a viable fetus. Rather, the Act defines the term "viable" to mean "the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(1)(c)(ii). In light of this inherently imprecise standard, the Court is unable to conclude, on the present record, that the abortions performed by Plaintiff Haskell at or near the end of the twenty-fourth week of pregnancy fall outside of the range of abortions proscribed by the post-viability portion of the Act. In reaching this conclusion, the Court recognizes that "[t]he time when viability is achieved may vary with each pregnancy[.]" *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 64, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). In addition, the record contains evidence indicating that premature infants at twenty-four weeks of age have maintained life outside the womb in neonatal intensive care. (Tr. 9–5–2000 at 126–127) (noting the existence of "quite a few 24–week deliveries"). As a result, the Court finds that Plaintiff Haskell has standing to challenge the post-viability provisions of HB 351. Given that Plaintiff Haskell has standing to challenge both HB 351's pre- and post-viability provisions, the Court need not address the standing of Plaintiff WMPC. *Carey v. Population Servs. Int'l,* 431 U.S. 678, 682, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (recognizing that when at least one plaintiff has standing to challenge all aspects of asserted claims, a court need not determine the standing of other plaintiffs).

■ Having addressed the foregoing threshold issues, the Court turns now to the requirements for obtaining preliminary injunctive relief. When considering whether an injunction is warranted, the Court must consider four factors: (1) the substantial likelihood of the Plaintiffs' success on the merits; (2) whether the injunction will save the Plaintiffs' patients from irreparable injury; (3) whether an injunction will harm others [1]; and (4) whether the public interest will be served by issuance of an injunction. *International Longshoremen's Ass'n v. Norfolk Southern Corp.,* 927 F.2d 900, 903 (6th Cir.1991),

---

[1]. This third prong is also construed as a "balancing of equities." This balancing requires the Court to consider whether the harm that would be suffered by the Plaintiffs if the injunction were not granted, outweighs the harm that would be suffered by the Defendants if the injunction were to be granted.

*cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (citing *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985)). The Court need not conclude that all four factors support its decision. *Blue Cross and Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n,* 110 F.3d 318, 334 (6th Cir.1997). Rather than being "rigid and unbending requirements" that must be satisfied, these factors are intended to guide the Court's discretion. *In re Eagle–Picher Industries, Inc.,* 963 F.2d 855, 859 (6th Cir.1992). For example, the degree of likelihood of success that is required to issue a preliminary injunction may vary according to the strength of the other factors. *In re DeLorean Motor Co.,* 755 F.2d at 1229. The Court must make specific findings as to each of these factors, unless fewer are dispositive of the issue. *International Longshoremen's Ass'n,* 927 F.2d at 903. With the foregoing requirements in mind, the Court will now address each of the four factors, based upon its consideration of the evidence in the record.[2]

### I. *Likelihood of Success on the Merits*

Plaintiff WMPC is an Ohio corporation that currently provides, and intends to continuing providing, medical services in Montgomery, Hamilton, and Summit Counties in Ohio. WMPC's services include the partial birth procedure identified in HB 351. The corporation, which fears criminal and civil liability for its actions after the effective date of this Act, sues on its own behalf and on behalf of physicians, counselors and staff that are employed at its various affiliated locations, as well as on behalf of women who receive medical services, including abortions, at these locations. Plaintiff Haskell, a physician, is the owner of WMPC. Haskell provides abortion services to women who reside throughout Ohio and other states. His patients include women seeking abortion services through the 24th week of pregnancy. Haskell utilizes the partial birth procedure banned by HB 351. He intends to continue providing abortion services in a manner contrary to the Act, after its effective date, thereby exposing himself to criminal prosecution and to civil liability.

The Plaintiffs have presented a number of arguments challenging the constitutionality of Ohio's ban on the partial birth procedure. As noted, *supra,* those arguments may be divided into four general categories: (1) arguments that HB 351 imposes an "undue burden" on a woman's right to obtain an abortion; (2) arguments that the Act lacks an adequate exception for a woman's health; (3) arguments that the Act is unconstitutionally vague; and (4) an argument that the Act unconstitutionally permits third-party civil suits against physicians who violate its terms. Before addressing the foregoing issues, the Court will provide a brief overview of the substantive law governing attempts to regulate abortions. In so doing, the Court will also place the present litigation in its historical context by beginning with a review of its decision of nearly five years ago in *Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051 (S.D.Ohio 1995) (Rice, J.), as well as the Sixth Circuit's review of that ruling in *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997). Finally, the Court will analyze the Supreme Court's recent opinion in *Stenberg v. Carhart,* —— U.S. ——, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), which struck down a Nebraska statute banning "partial birth abortion."

### A. *Substantive Law Regarding Regulation of Abortion*

In *Voinovich,* this Court reviewed the Plaintiffs' challenge to the constitutionality of a legislative act known as House Bill 135

---

**2.** Throughout this Opinion, the Court will incorporate the factual findings upon which it relies to resolve the pending Motion for a Preliminary Injunction. The Court adopts those factual findings as its "Findings of Fact" for purposes of Fed.R.Civ.P. 52(a). *See* *Voinovich,* 911 F.Supp. at 1094 n. 44 (recognizing that Rule 52(a) does not require a court to set forth separate findings of fact, provided that the record adequately indicates the factual basis for a court's legal conclusions).

("HB 135"), which represented the first attempt by the State of Ohio to ban a particular method of abortion. HB 135 actually created two separate bans. *First,* it banned an abortion procedure that Plaintiff Haskell referred to, until recently, as a "dilation and extraction" ("D & X").[3] The ban on the D & X procedure applied both to pre-viability and to post-viability abortions. *Voinovich,* 911 F.Supp. at 1057. *Second,* HB 135 banned *all* post-viability abortions, except when necessary to prevent a woman's death, or to avoid a serious risk of substantial and irreversible impairment of a major bodily function. *Id.*

Upon review, this Court found a substantial likelihood that both of the foregoing bans were unconstitutional. In reaching this conclusion, the Court first examined the substantive law governing the ability of States to regulate abortions. Among other things, the Court identified the proper analytical framework for reviewing such regulations, noting that the viability of the fetus now operates as a significant line of demarcation:

> In *Planned Parenthood v. Casey,* a plurality of the Supreme Court held that viability marks the point at which the State's interest in protecting the potential life of the fetus outweighs the pregnant woman's liberty interest in having an abortion, subject only to a medical determination that her own life or health is at risk. 505 U.S. at 868–70, 874–77, 112 S.Ct. at 2816–17, 2819–2821. Before viability, states may not enact regulations which have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion. . . ." 505 U.S. at 877, 112 S.Ct. at 2820. Such regulations constitute an "undue burden" on a pregnant woman's right to have an abortion, and are an unconstitutional violation of her liberty interest, as guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.* at 874–75, 112 S.Ct. at 2819. After viability, however, the State may regulate and proscribe abortions "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. at 2821. Therefore, whereas regulations which affect pre-viability abortions are subject to an undue burden analysis, regulations which apply only to post-viability abortions are presumptively valid, unless they have an adverse impact on the life or health of the pregnant woman.

*Id.* at 1059–1060.[4]

In *Voinovich,* this Court also identified the proper standard for reviewing facial challenges to the constitutionality of abortion regulations.[5] Traditionally, a party

---

**3.** Haskell now refers to the D & X method of abortion as an "intact D & E." The Court will discuss the various methods of performing an abortion more fully, *infra.*

**4.** In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that a pregnant woman has a constitutional right to privacy, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which prevents states from proscribing abortion before viability. 410 U.S. at 147–65, 93 S.Ct. at 724–33. As this Court noted in *Voinovich, Roe* also established a trimester framework for analyzing the extent of a woman's right to privacy. In *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court reaffirmed *Roe's* "central holding" that, prior to viability, a State could not prohibit any woman from obtaining an abortion. However, the *Casey* Court placed a greater emphasis on a State's interest in potential life throughout pregnancy. As a result, the Court discarded *Roe's* trimester framework and allowed States to regulate pre-viability abortions, provided that such regulations do not impose an "undue burden" on a woman's ability to obtain an abortion. *Id.* at 877, 112 S.Ct. at 2820–21.

**5.** In *Voinovich,* this Court explained the difference between challenging a statute "on its face" and challenging a statute "as applied." *Voinovich,* 911 F.Supp. at 1060 n. 11. When challenging a statute "as applied," a plaintiff must show that application of the statute is unconstitutional in his particular situation. *Id.* When challenging a statute "on its face," however, a plaintiff ordinarily must show that a statute is unconstitutional in all situations (*i.e.,* that it cannot be applied constitutionally under any set of circumstances).

bringing such a challenge faced the difficult burden of establishing "that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In *Casey*, however, the Supreme Court stated that a law regulating abortion is unconstitutional on its face if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791. In *Voinovich*, this Court concluded that *Casey* displaced *Salerno* in the abortion context, introducing a new standard for facial challenges to abortion laws. This Court also determined that the *Casey* standard applied both to pre-viability and to post-viability abortion regulations. *Voinovich*, 911 F.Supp. at 1062.

Finally, in *Voinovich*, this Court recognized that vagueness may render a law regulating abortion unconstitutional. In relevant part, the Court explained:

> ... When determining whether a statute or regulation is sufficiently vague so as to violate due process, there are several relevant considerations. A statute or regulation may be vague if it fails to give fair warning as to what conduct is prohibited. A statute or regulation may also be vague if it is subject to arbitrary and discriminatory enforcement, due to a failure to provide explicit standards for those who apply the law. Finally, the lack of a *mens rea* requirement in a statute which imposes criminal liability may indicate that the statute is unconstitutionally vague.
>
> A vague law is especially problematic in two situations. First, its potential to cause citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked," is of particular concern where the exercise of constitutionally protected rights may be inhibited or "chilled." Second, a vague law which provides for criminal penalties is troubling because of the severe consequences which may result from violating the law. When determining whether a law is void for vagueness, this Court must examine the challenged law in light of all of the above considerations.

*Voinovich*, 911 F.Supp. at 1063 (citations omitted).

With the foregoing standards in mind, this Court concluded in *Voinovich* that HB 135 was unconstitutional, insofar as it purported to ban the D & X method of abortion, which was defined as "[t]he termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain." *Id.* The Court first found the definition of the banned D & X procedure to be unconstitutionally vague, because it could be construed as sweeping within its reach the non-proscribed, most common method of second-trimester abortion known as "dilation and evacuation" ("D & E"). In reaching this conclusion, the Court recognized that the D & E procedure typically involved dismemberment of the fetus by means of suction curettage and the use of forceps, whereas the D & X procedure involved removing all but the head of an intact fetus before compressing the head with suction. *Voinovich*, 911 F.Supp. at 1066. Regardless of whether the fetus was removed intact or dismembered, however, the Court concluded that in *both* the D & X procedure and the D & E procedure, "a suction device may be purposely inserted into the skull in order to remove the skull contents, to accomplish the goal of decompressing the fetal head, thereby facilitating its removal from the woman's body." *Id.* at 1067. As a result, this Court held that HB 135 was unconstitutionally vague, because it did not provide physicians with fair warning as to what conduct it permitted and what conduct would expose them to civil and criminal liability. *Id.*

In *Voinovich*, this Court found HB 135 to be unconstitutional for a second reason as well. Relying upon *Casey*, the Court concluded that, insofar as HB 135 imposed a pre-viability ban on the D & X proce-

dure, it constituted an undue burden on a woman's ability to obtain an abortion. In reaching this conclusion, the Court compared the D & X procedure to other available methods and determined that use of the D & X procedure in the late second trimester of pregnancy appeared "to pose less of a risk" to maternal health than any other method of abortion. *Id.* at 1070. As a result, the Court reasoned as follows:

> Because the D & X procedure appears to have the potential of being a safer procedure than all other available abortion procedures, this Court holds that the Plaintiff has demonstrated a substantial likelihood of success of showing that the state is not constitutionally permitted to ban the procedure. If this abortion procedure, which appears to pose less of a risk to maternal health than any other alternative, were banned, and women were forced to use riskier and more deleterious abortion procedures, the ban could have the effect of placing a substantial obstacle in the path of women seeking pre-viability abortions, which would be an undue burden and thus unconstitutional under *Casey.*

*Id.* at 1070.

Finally, in *Voinovich,* this Court turned to the portion of HB 135 which banned all post-viability abortions, except when necessary to preserve the life or health of the woman. Specifically, HB 135 banned the performance of all post-viability abortions, unless:

> (1) the physician determines, in good faith and in the exercise of reasonable medical judgment, that the abortion is necessary to prevent the death of the pregnant woman or [medically necessary to prevent] a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman, [or]

> (2) the physician determines, in good faith and in the exercise of reasonable medical judgment, after making a determination relative to the viability of the unborn human in conformity with [§ 2919.18(A) ], that the unborn human is not viable.

*Id.* at 1075.[6]

HB 135 also obligated a physician to comply with a number of regulations in order to perform a post-viability abortion under the first of the foregoing two exceptions. Those regulations applied absent a "medical emergency," which the statute defined as:

> [A] condition that a pregnant woman's physician determines, in good faith and in the exercise of reasonable medical judgment, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

*Id.* at 1076.

Upon review, this Court found the post-viability ban on abortions in HB 135 unconstitutional for several reasons. For present purposes, it is necessary to address only two of them. *First,* with respect to the medical necessity exception to the post-viability ban, the Court held that the exception was unconstitutional, because it applied only when a woman's physical health was threatened, and failed to account for situations in which her mental health was at risk. *Id.* at 1078–1081. *Second,* with respect to the medical emergency exception to the post-viability abortion regulations, the Court found the stat-

---

**6.** The statute defined a "serious risk of the substantial and irreversible impairment of a major bodily function" as follows:

> [A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substan-

tial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions: (1) pre-eclampsia; (2) inevitable abortion; (3) prematurely ruptured membrane; (4) diabetes; (5) multiple sclerosis.

ute's definition of "medical emergency" unconstitutional because, among other things, it lacked a *mens rea,* or scienter, requirement.[7] *Id.* at 1081–1087. Absent such a requirement, the Court noted that physicians could face civil and criminal liability even when, in their best medical judgment, a post-viability abortion was required to preserve the life or health of the mother. *Id.* at 1084. Based on the foregoing reasoning, this Court granted a preliminary injunction on December 13, 1995, prohibiting the enforcement of House Bill 135. *Id.* at 1094. With the agreement of the parties, the Court later entered a permanent injunction and final judgment in favor of the Plaintiffs, barring enforcement of the legislation, on the record of the proceedings had on the Plaintiffs' request for a preliminary injunction and the decision rendered thereafter.

The Defendants subsequently appealed to the Sixth Circuit Court of Appeals, which affirmed this Court's entry of a permanent injunction. In so doing, the Sixth Circuit agreed that an abortion law is unconstitutional, on its face, if " 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.' " *Voinovich,* 130 F.3d at 194 (quoting *Casey,* 505 U.S. at 895, 112 S.Ct. 2791). The Sixth Circuit also agreed that this standard applies both to pre-viability and to post-viability abortion laws. *Id.* at 196. In addition, the Sixth Circuit recognized that HB 135's ban on the D & X procedure encompassed the D & E procedure as well. In relevant part, the court explained:

... [T]he Act's definition of the D & X procedure encompasses the D & E procedure, because the D & E procedure can also entail suctioning the skull contents of the fetus. The primary distinction between the two procedures is that the D & E procedure results in a dismembered fetus while the D & X procedure results in a relatively intact fetus. More specifically, the D & E procedure involves dismembering the fetus in utero before compressing the skull by means of suction, while the D & X procedure involves removing intact all but the head of the fetus from the uterus and then compressing the skull by means of suction. In both procedures, the fetal head must be compressed, because it is usually too large to pass through a woman's dilated cervix. In the D & E procedure, this is typically accomplished by either suctioning the intracranial matter or by crushing the skull, while in the D & X procedure it is always accomplished by suctioning the intracranial matter.

*Voinovich,* 130 F.3d at 199 (footnote omitted).

Given that the definition of the prohibited abortion method in HB 135 encompassed both the D & E and the D & X procedures, the Sixth Circuit concluded that the statute imposed an undue burden on a woman's ability to obtain a pre-viability abortion:[8]

Because the definition of the banned procedure includes the D & E procedure, the most common method of abortion in the second trimester, the Act's prohibition on the D & X procedure has the effect "of placing a substantial obsta-

---

7. "The term 'scienter' means 'knowingly' and is 'frequently used to signify the defendant's guilty knowledge.' " *Voinovich,* 911 F.Supp. at 1081 (quoting *Black's Law Dictionary* 1207 (5th ed.1979). "The term *'mens rea '* refers to a guilty mind, a guilty or wrongful purpose, a criminal intent." *Id.* "Both of these terms require that a defendant have some degree of guilty knowledge, or some degree of blameworthiness or culpability, in order to be criminally liable." *Id.*

8. As set forth above, this Court found HB 135 to be unconstitutionally "vague," because it swept in both the D & X procedure and the D & E procedure. In its analysis, however, the Sixth Circuit did not treat this problem as one of vagueness. Rather, the Sixth Circuit concluded that HB 135 simply imposed an undue burden on a woman's ability to obtain a pre-viability abortion, because it banned the D & E, the most commonly performed second trimester abortion procedure. *Voinovich,* 130 F.3d at 201.

cle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. at 2820. It does not matter that the D & E procedure typically is not performed late in the second trimester, when use of the D & X procedure is more common, because the State may prosecute physicians who perform the D & E procedure at any time under the Act's definition of the banned procedure, which contains no temporal limitations. In other words, the definition of the banned procedure in no way limits its application to late second trimester abortions. As in *Danforth*, the Act bans the most commonly used second trimester procedure and therefore is an unconstitutional burden on a woman's right to choose to have an abortion.

*Id.* at 201 (footnote omitted).

With respect to HB 135's post-viability ban on the D & X procedure, the Sixth Circuit assumed, *arguendo*, that the legislation was constitutional "[b]ecause a State can proscribe all abortions post-viability, when not required for the life and health of the mother[.]" *Id.* at 202.[9] Nevertheless, the court concluded that the post-viability ban on that procedure could not be severed from the pre-viability ban on the D & X procedure.[10] *Id.*

The Sixth Circuit next agreed that HB 135's post-viability ban on all abortions was unconstitutional. In reaching this conclusion, the court found both the medical necessity and medical emergency exceptions to be impermissibly vague, because they lacked scienter requirements. *Id.* at 203. In support, the court recognized that "[t]he determination of whether

a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being disputed by others." *Id.* at 205.

Finally, the Sixth Circuit agreed that HB 135 was unconstitutional, because it failed to allow post-viability abortions in cases involving a serious risk of substantial and irreversible impairment of a pregnant woman's mental health. *Id.* at 206. As set forth above, the statute's medical necessity exception allowed a post-viability abortion to avert a woman's death or to avoid a "serious risk of the substantial and irreversible impairment of a major bodily function." HB 135 defined the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" to mean:

[A]ny medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions:

(1) Pre-eclampsia;

(2) Inevitable abortion;

(3) Prematurely ruptured membrane;

(4) Diabetes;

(5) Multiple sclerosis.

*Id.* at 206.

Upon review, the Sixth Circuit determined that the foregoing definition appeared to be limited to physical health risks. The court also noted that the definition was similar to language used in *Casey*, a case that involved physical health risks.[11] *Id.* at 207. Although the Supreme

**9.** The Sixth Circuit noted, however, that "striking down the entire D & X ban on the ground that it poses an undue burden would be consistent with *Casey*, in which the plurality analyzed provisions with application before viability under the undue burden standard even though those provisions were not specifically limited to pre-viability abortions...." *Voinovich*, 130 F.3d at 202 n. 14.

**10.** The court explained:
... [T]he language of the ban simply makes it not susceptible to severance.

Post-viability application of the ban cannot be separated from pre-viability application of the ban so that it may stand alone. There is no clause or word dealing with post-viability application of the ban. We essentially would have to rewrite the Act in order to create a provision which could stand by itself.... *Voinovich*, 130 F.3d at 202.

**11.** In HB 135, the Ohio legislature had indicated its intent for the phrase "serious risk of the substantial and irreversible impairment of

Court found the definition in Casey to be constitutional, despite the fact that it was limited to physical health risks, the Sixth Circuit distinguished Casey and concluded that HB 135 could not ban post-viability abortions, without including an exception when termination of the pregnancy was necessary to preserve a woman's mental health. Id. at 208. Specifically, the Sixth Circuit noted that Casey had involved a regulation that merely delayed a woman's ability to obtain an abortion, whereas HB 135 banned post-viability abortions. Id. Given that HB 135 prohibited post-viability abortions entirely, the Sixth Circuit reasoned that the exception to the ban was required to encompass "situations where a woman would suffer severe mental or emotional harm if she were unable to obtain an abortion." Id. at 209. Given that HB 135 lacked such an exception, the court found the statute's post-viability ban on abortions to be unconstitutional.

Three years later, in Stenberg v. Carhart, —— U.S. ——, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000),[12] the Supreme Court reviewed a physician's facial challenge to the constitutionality of Nebraska's "partial birth abortion" statute. The law at issue in Carhart provided as follows:

> No partial birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.

Id. at 2604–2605. The statute defined the phrase "partial birth abortion" as "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." Id. at 2605. In addition, the phrase "partially delivers vaginally a living unborn child before killing the unborn child" was defined to mean "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." Id.

Upon review, the Supreme Court found the Nebraska statute to be unconstitutional for two reasons. First, it lacked an exception allowing the partial birth procedure to be performed when that procedure was the safest abortion method available. Id. at 2609–13. The Court concluded that such an exception was necessary, because the record demonstrated that, in some cases, the banned procedure was, in fact, safer than any alternative. Second, the Court concluded that the definition of the banned procedure swept in the D & E method of abortion, which is the most commonly used procedure for performing second trimester abortions. Id. at 2613–2617.

In reaching the foregoing conclusions, the Carhart Court first reiterated three well-established principles of its abortion-law jurisprudence: (1) "before 'viability . . . the woman has a right to choose to terminate her pregnancy'"; (2) "'a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability' is unconstitutional"; and (3) "'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" Id. at 2604 (quoting Casey, 505 U.S. at 870, 877, 879, 112 S.Ct. 2791).

■ After recognizing these three principles, the Court applied them to the language of the Nebraska statute, which applied to both pre-viability and to post-viability abortions. As an initial matter, the Court noted that Nebraska's interest in regulating pre-viability abortions was considerably weaker than its interest in

a major bodily function" to be construed consistent with Casey. See Voinovich, 130 F.3d at 207.

**12.** The Supreme Court decided Carhart on June 28, 2000.

regulating post-viability abortions. Given that *Casey* required a health exception to validate a post-viability abortion law, the Court reasoned that at least the same exception was required with respect to a pre-viability regulation. In other words, regardless of viability, or the lack thereof, any statute regulating abortion must include an exception " 'where it is necessary in appropriate medical judgment for the preservation of the life or health of the mother[.]' " [13] *Id.* at 2609 (quoting *Casey*, 505 U.S. at 879, 112 S.Ct. 2791). According to the *Carhart* Court, this requirement stems from the well-established principle that a "State may promote but not endanger a woman's health when it regulates the methods of abortion." *Id.*

With the foregoing requirements in mind, the Court concluded that Nebraska's statute was unconstitutional, because it lacked *any* exception for a woman's health. Although the statute included an exception covering cases in which a woman's life was "endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself[,]" the statute *did not* contain an exception for instances when the banned "partial birth abortion" procedure was *safer* than any available alternative. In *Carhart*, the Court held that such an exception was constitutionally mandated. In so ruling, the majority rejected Justice Thomas' view that an exception is required only in situations where a woman's pregnancy itself threatens her health:

Justice THOMAS says that the cases just cited limit this principle to situations where the pregnancy *itself* creates a threat to health. *See post*, at 2651. He is wrong. The cited cases, reaffirmed in *Casey*, recognize that a State cannot subject women's health to significant risks both in that context, *and also* where state regulations force women to use riskier methods of abortion. Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely. Our holding does not go beyond those cases, as ratified in *Casey*.

*Id.* at 2609.

Having determined that a ban on a particular method of abortion must contain a health exception allowing the banned procedure to be performed if it is safer than any alternative, the Court examined the record to determine whether, in some cases, the "partial birth" procedure, as defined in the Nebraska statute, was the safest means of terminating a pregnancy. *Id.* at 2610. Before resolving this issue, the Court reviewed the risks associated with various methods of performing an abortion. In conducting its review, the Court found the terms "intact D & E" and "D & X" sufficiently similar to be used interchangeably.[14] *Id.* at 2608. The *Car-*

13. Although a State cannot ban pre-viability abortions entirely, it may regulate them, provided that such regulations do not impose an undue burden. *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. In *Carhart,* however, the Supreme Court recognized that any law which regulates, but does not proscribe, pre-viability abortions must include an exception, allowing a woman to circumvent the regulations when her life or health is at risk.

14. The *Carhart* Court described the "intact D & E" procedure as follows:
   ... Like other versions of the D & E technique, it begins with induced dilation of the cervix. The procedure then involves removing the fetus from the uterus through the cervix "intact," *i.e.,* in one pass, rather than in several passes. It is used after 16 weeks at the earliest, as vacuum aspiration becomes ineffective and the fetal skull becomes too large to pass through the cervix. The intact D & E proceeds in one of two ways, depending on the presentation of the fetus. If the fetus presents head first (a vertex presentation), the doctor collapses the skull; and the doctor then extracts the entire fetus through the cervix. If the fetus presents feet first (a breech presentation), the doctor pulls the fetal body through the cervix, collapses the skull, and extracts the fetus through the cervix. The breech ex-

*hart* Court also construed Nebraska's prohibition of "partial birth abortions" as an attempt to ban these procedures.

After reviewing the record, however, the Court found substantial evidence supporting the district court's conclusion that, in some circumstances, a D & X abortion would be the safest procedure (*i.e.*, safer than any available alternative). *Id.* at 2612. As a result, the Court rejected Nebraska's argument that a health exception was never "necessary" to preserve the health of women. *Id.* at 2613. In reaching this conclusion, the Court examined *Casey's* use of the phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 2612. The Court reasoned that the phrase

> cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey's* words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion-differences of a sort that the American Medical Association and American College of Obstetricians and Gynecologists' statements together indicate are present here.

*Id.* at 2612.

Based upon the foregoing interpretation of *Casey*, the Court reasoned that a health exception must encompass a situation

"[w]here a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view...." *Id.* at 2613. Given that Nebraska's statute lacked such an exception, the Court found it to be unconstitutional.

As noted above, the Court also invalidated the partial birth abortion statute for a second reason. In particular, the Court concluded that it imposed an undue burden on a woman's right to terminate her pregnancy before viability. Stated differently, the Court reasoned that the statute had the "'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *Id.* at 2613 (quoting *Casey*, 505 U.S. at 877, 112 S.Ct. 2791). In reaching this conclusion, the Court held that the statute's definition of the phrase "partial birth abortion" encompassed *both* the D & E procedure and the D & X procedure. As set forth above, the relevant statutory language prohibited "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child." *Id.* After reviewing this language, the Court stated:

> ... We do not understand how one could distinguish, using this language, between D & E (where a foot or arm is drawn through the cervix) and D & X (where the body up to the head is drawn through the cervix). Evidence before the trial court makes clear that D & E will often involve a physician pulling a

---

traction version of the intact D & E is also known commonly as "dilation and extraction," or D & X....

*Carhart*, 120 S.Ct. at 2607 (citations omitted).

After describing the "intact D & E" procedure, the Court recognized that "[t]he American College of Obstetricians and Gynecologists describes the D & X procedure in a manner corresponding to a breech-conversion intact D & E, including the following steps:

"1. deliberate dilatation of the cervix, usually over a sequence of days;

"2. instrumental conversion of the fetus to a footling breech;

"3. breech extraction of the body excepting the head; and

"4. partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus."

*Id.* at 2608 (citation omitted).

"substantial portion" of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus. Indeed D & E involves dismemberment that commonly occurs only when the fetus meets resistance that restricts the motion of the fetus: "The dismemberment occurs between the traction of . . . [the] instrument and the counter-traction of the internal os of the cervix." And these events often do not occur until after a portion of a living fetus has been pulled into the vagina.

Even if the statute's basic aim is to ban D & X, its language makes clear that it also covers a much broader category of procedures. The language does not track the medical differences between D & E and D & X—though it would have been a simple matter, for example, to provide an exception for the performance of D & E and other abortion procedures. Nor does the statute anywhere suggest that its application turns on whether a portion of the fetus' body is drawn into the vagina as part of a process to extract an intact fetus after collapsing the head as opposed to a process that would dismember the fetus. Thus, the dissenters' argument that the law was generally intended to bar D & X can be both correct and irrelevant. The relevant question is not whether the legislature wanted to ban D & X; it is whether the law was intended to apply only to D & X. The plain language covers both procedures. . . . Both procedures can involve the introduction of a "substantial portion" of a still living fetus, through the cervix, into the vagina—the very feature of an abortion that leads Justice THOMAS to characterize such a procedure as involving "partial birth."

*Id.* at 2613–2614 (citations omitted).[15]

In a concurring opinion, Justice O'Connor agreed that Nebraska's ban on partial birth abortions could not be reconciled with *Casey* and, therefore, was unconstitutional. *Id.* at 2618 (O'Connor, J., concurring). In reaching this conclusion, Justice O'Connor recognized that several states had enacted more narrowly drawn statutes that banned only the D & X method of abortion.[16] According to Justice O'Connor, if a state limited application of its partial birth abortion statute to the D & X procedure and included an adequate exception for the life and health of the mother, such a statute would be constitutional. *Id.* at 2620. Given that Nebraska's statute failed to meet these criteria, however, Justice O'Connor joined four other members of the Court and declared the statute unconstitutional.[17]

Having reviewed the substantive law that governs the ability of States to regulate abortion, and having examined both Ohio's prior attempt to regulate abortion through HB 135 and the Supreme Court's recent pronouncement on "partial birth abortion" in *Carhart,* the Court turns now to the present litigation, which involves the Plaintiffs' facial challenge to the constitutionality of HB 351. As a means of analysis, the Court first will review the pertinent language of that statute.

---

**15.** The Court also refused to adopt Nebraska's proposed narrowing construction of the statute. Specifically, the Court declined the State's request to interpret the phrase "substantial portion" to mean "the child up to the head." *Carhart,* 120 S.Ct. at 2614.

**16.** For example, Justice O'Connor cited a Montana statute which defined the banned procedure as one in which:

(A) the living fetus is removed intact from the uterus until only the head remains in the uterus;

(B) all or a part of the intracranial contents of the fetus are evacuated;

(C) the head of the fetus is compressed; and

(D) following fetal demise, the fetus is removed from the birth canal.

*Id.* at 2619 (quoting Mont.Code Ann. § 50–20–401(3)(c)(ii) (Supp.1999)).

**17.** Chief Justice Rehnquist dissented in *Carhart,* along with Justices Scalia, Kennedy and Thomas.

**B.** *Substantive Provisions of Substitute House Bill 351*

HB 351 generally prohibits physicians from performing abortions by using what the Act identifies as a "partial birth procedure." This prohibition applies to the performance of both pre-viability and post-viability abortions.[18] *See* Ohio Rev.Code § 2919.151(B) (prohibiting use of the partial birth procedure when the fetus is viable); Ohio Rev.Code § 2919.151(C) (prohibiting use of the partial birth procedure when the fetus is not viable). Specifically, the Act provides that

... no person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is not necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(B) (post-viability) and (C) (pre-viability).

HB 351 defines the banned "partial birth procedure" as "the medical procedure that includes all of the following elements in sequence:"

(a) intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

(b) in a breach presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;

(c) intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which

procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

(d) completion of the vaginal delivery of the fetus.

Ohio Rev.Code § 2919.151(A)(3).

The Act defines "from the body of the mother" to mean "that the portion of the fetus' body in question is beyond the mother's vaginal introitus in a vaginal delivery." Ohio Rev.Code § 2919.151(A)(2). The Act expressly excludes from its reach the "suction curettage procedure of abortion," the "suction aspiration procedure of abortion," and the "dilation and evacuation procedure of abortion." Ohio Rev.Code § 2919.151(F). The Act also provides that the "dilation and evacuation procedure of abortion does not include the dilation and extraction procedure of abortion." Ohio Rev.Code § 2919.151(A)(1). The phrases "suction curettage procedure of abortion," "suction aspiration procedure of abortion," "dilation and evacuation procedure of abortion," and "dilation and extraction procedure of abortion" are not defined in the Act.

As noted, *supra*, HB 351 also includes an exception for the life and health of the mother. That exception permits the partial birth procedure to be performed when it is

... necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(B) (post-viability) and (C) (pre-viability). The Act defines the phrase "serious risk of the substantial and irreversible impairment of a

---

**18.** The term "viable," as used in HB 351, "means the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(1)(c)(ii).

major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

Finally, the ban against the partial birth procedure does not apply to a person "who performs or attempts to perform a legal abortion if the act that causes the death of the fetus is performed prior to the fetus being partially born even though the death of the fetus occurs after it is partially born." Ohio Rev.Code § 2919.151(G). "Partially born" is defined to mean that, in a breech presentation, "at least the lower torso to the navel, but not the entire body, of an intact fetus" and in a cephalic presentation, "at least the complete head, but not the entire body, of an intact fetus," has been intentionally extracted from the body of the mother. Ohio Rev.Code § 2919.151(A)(4); Ohio Rev.Code § 2919.151(A)(3)(b).

A person who unlawfully performs the "partial birth procedure" is guilty of the crime of "partial birth feticide," which is second-degree felony. Ohio Rev.Code § 2919.151(D). In addition, such a person may be civilly liable for compensatory and punitive damages. Ohio Rev.Code § 2307.53(B).

In support of their Motion for a Preliminary Injunction, the Plaintiffs have asserted several constitutional challenges to the language of HB 351. Having examined the pertinent statutory language, the Court turns now to the merits of the Plaintiffs' arguments.

## C. Analysis of Plaintiffs' Constitutional Challenges to HB 351

As set forth above, the Plaintiffs contend that HB 351 is unconstitutional for numerous reasons. For purposes of ruling on the pending Motion for a Preliminary Injunction, the Court has chosen to structure its analysis as follows. *First,* the Court will determine whether the Plaintiffs have demonstrated a substantial likelihood of success on their argument that the Act is unconstitutional, insofar as it restricts a woman's ability to abort a *non-viable* fetus. In resolving this question, the Court will address two sub-issues: (1) whether HB 351 imposes an undue burden on a woman's ability to obtain a pre-viability abortion, because it defines the phrase "partial birth procedure" in a way that prohibits the D & E procedure, which is the most commonly used method for performing second-trimester abortions; and (2) whether the Act's pre-viability ban on the "partial birth procedure" contains an adequate exception for the life of the woman. *Second,* the Court will determine whether the Plaintiffs have demonstrated a substantial likelihood of success with respect to their argument that HB 351 is unconstitutional, insofar as it restricts a woman's ability to abort a *viable* fetus. In resolving this question, the Court again will address two sub-issues: (1) whether the Act's post-viability ban on the "partial birth procedure" contains a sufficient exception for the health of the woman; and (2) whether the Act contains an adequate scienter requirement.[19]

### 1. Constitutionality of HB 351 Before Fetal Viability

#### a. Undue Burden on Woman's Ability to Obtain Pre-viability Abortion

The Plaintiffs argue that the definition of a "partial birth procedure" set forth in HB 351 is unconstitutional, because it encompasses a method of abortion known as the D & E procedure, which is the most

---

**19.** For *post-viability* purposes, it is immaterial whether HB 351 encompasses the commonly performed D & E method of abortion. As noted above, after viability, the State may regulate or even prohibit abortion by any method, "except where necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Carhart,* 120 S.Ct. at 2604. Consequently, insofar as HB 351 regulates post-viability abortions, the critical inquiry is whether it contains an adequate health exception. The issue of whether the Act sweeps in both the D & E and the D & X is not material in the post-viability context.

common abortion procedure used in the second trimester of pregnancy. In response, the Defendants contend that the phrase "partial birth procedure" in HB 351 is narrowly defined and does not include the D & E procedure. Moreover, the Defendants note that the Act expressly excludes the D & E procedure, as well as other common methods of abortion, from its reach. *See* Ohio Rev.Code § 2919.151(F).

In order to resolve this dispute, it is necessary to describe several methods of abortion. This Court previously defined and described those procedures in *Voinovich,* based upon largely the same evidence that has been presented herein. For present purposes, however, the Court will once again review the various alternatives available to a woman who chooses to terminate her pregnancy.

*Suction Curettage/Vacuum Aspiration*

Approximately 90 percent of all abortions performed in the United States take place during the first trimester of a woman's pregnancy. During that time, the most common method of abortion is the "suction curettage" or "vacuum aspiration" procedure.[20] (Def. Exh. L at 62–63; Pl. Exh. 18 at 39). This procedure, which may require dilation of the cervix, involves insertion of a cannula (a vacuum tube) into the uterus to evacuate the contents. (Def. Exh. L at 63; Pl. Exh. 18 at 39). The vacuum aspiration method of abortion may be performed through the early second trimester of pregnancy. (Def. Exh. L at 64).

*Induction/Instillation*

During the second trimester of pregnancy, some women obtain an abortion through a procedure known as "induction" or "instillation." (Def. Exh. L at 63–64; Pl. Exh. 18 at 42). This procedure involves the injection of saline into a woman's uterus to induce labor. It causes cramping and results in the expulsion of the fetus after a period of twenty-four to thirty-six hours. (Pl. Exh. 18 at 42). Although this method of abortion was common in the 1970s, physicians use it less frequently today, because it requires a hospital stay and causes an extended period of pain for the woman. (Pl. Exh. 18 at 42–43; Def. Exh. L at 63–64).

*Hysterotomy/Hysterectomy*

Another possible way for a woman to terminate her pregnancy during the second trimester is to undergo a "hysterotomy." (Pl. Exh. 26 at 37). This method of abortion is an invasive surgical procedure that requires the use of a general anesthesia. (*Id.*) It involves the removal "of the pregnant uterus, with the pregnancy intact." (*Id.*). The hysterotomy is used only in very rare cases. (*Id.*). The "hysterectomy" is another rarely used procedure that requires the use of general anesthesia. (*Id.* at 37–38). It involves an incision into the uterine wall to remove the products of conception. (*Id.* at 38).

*Dilation and Evacuation ("D & E")*

The most commonly used method of abortion during the second trimester of pregnancy is known as a "dilation and evacuation" ("D & E") procedure. (Pl. Exh. 18 at 47). This procedure begins with the insertion of laminaria into the cervix in order to achieve dilation. Once the cervix is dilated, the physician removes the contents of the uterus by using both forceps and suction. (Pl. Exh. 22 at 116; Pl. Exh. 26 at 36–37). Typically, a suction curette is first placed through the cervix and into the uterus to remove the amniotic fluid. (Pl. Exh. 30 at 35). This process alone often removes some of all of the fetal tissue, particularly early in the second trimester. (*Id.*). Whenever some or all of the fetus remains inside the uterus, a physician uses forceps in order to dismember the fetus and to facilitate removal. (*Id.*). This procedure involves "breaking up of the fetal parts." (Pl. Exh. 22 at 119; *see also* Pl. Exh. 24 at 122). The fetus is dismembered "piece by piece" in utero. (Def. Exh. K at 190, 194). The D & E procedure is used in the vast majority of

---

**20.** These terms mean the same thing and are used interchangeably. (Def. Exh. K at 188).

second-trimester abortions, including those involving women who are eighteen to twenty-four weeks pregnant. (Pl. Exh. 26 at 63).

### Dilation and Extraction ("D & X")

The Dilation and Extraction ("D & X") method of abortion is typically used in the late second trimester from the twentieth to twenty-fourth week of pregnancy. The American College of Obstetricians and Gynecologists ("ACOG") has issued a policy statement which defines the "Intact Dilation and Extraction" procedure as follows:

1.  deliberate dilation of the cervix, usually over a sequence of days;
2.  instrumental conversion of the fetus to a footling breech;
3.  breech extraction of the body excepting the head; *and*
4.  partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

(Def.Exh. B).

Plaintiff Haskell performs a variation of the D & X procedure described by ACOG. In *Voinovich,* this Court provided the following review of Haskell's procedure, which is typically used late in the second trimester, from twenty to twenty-four weeks:

> On the first and second days of the procedure, Dr. Haskell inserts dilators into the patient's cervix. On the third day, the dilators are removed and the patient's membranes are ruptured. Then, with the guidance of ultrasound, Haskell inserts forceps into the uterus, grasps a lower extremity, and pulls it into the vagina. With his fingers, Haskell then delivers the other lower extremity, the torso, shoulders, and the upper extremities. The skull, which is too big to be delivered, lodges in the internal cervical os. Haskell uses his fingers to push the anterior cervical lip out of the way, then presses a pair of

scissors against the base of the fetal skull. He then forces the scissors into the base of the skull, spreads them to enlarge the opening, removes the scissors, inserts a suction catheter, and evacuates the skull contents. With the head decompressed, he then removes the fetus completely from the patient.

*Voinovich,* 911 F.Supp. at 1066 (footnotes omitted).[21]

Having reviewed the foregoing procedures, the Court concludes that the primary distinction between the D & E and the D & X is that the D & E involves fetal dismemberment and the D & X results in an intact fetus. (Pl. Exh. 22 at 126). Whereas the traditional D & E involves "the use of forceps and/or crushing instruments for dismemberment of the fetus and removing the fetus in parts," (Pl. Exh. 26 at 48), the D & X procedure involves "the delivery of the fetus essentially intact." (*Id.*). During a 1992 presentation, Plaintiff Haskell himself noted that the D & X procedure "differs from classic D & E in that it does not rely upon dismemberment to remove the fetus...." (Tr. 9–6–2000 at 16). This finding is consistent with *Voinovich,* wherein this Court concluded that

> [t]he primary distinction between this D & X procedure and the D & E procedure previously described appears to be that, whereas the D & E procedure results in dismemberment and piece-by-piece removal of the fetus from the uterus-and, possibly, in removal of portions of the skull contents by the use of suction after the skull is crushed with forceps or otherwise invaded, and before the head is placed next to the opening to the uterus-the D & X procedure results in a fetus which is removed basically intact except for portions of the skull contents, which are suctioned out after the head is placed next to the opening to the uterus (and after the rest of the

---

**21.** In *Voinovich,* this Court based its description of Haskell's procedure on a paper that he presented at the National Abortion Federation Conference in 1992. That paper is contained in the record at Defendants' Exh. D. For present purposes, the Court finds that the paper accurately describes Haskell's procedure.

fetus is removed from the uterus), and before the fetus is fully removed from the mother's body. The hallmark of the D & X procedure, therefore, is that the fetus is removed intact, rather than being dismembered prior to removal, as is done in a D & E procedure. In both procedures, the head usually must be decompressed, either by crushing the skull, or by invading the skull and suctioning out its contents. In the D & X procedure, the suctioning is purposeful; in a D & E procedure, the suction may either be purposeful, or, given the inability to clearly see the fetus, even with ultrasound, and the consequent difficulty of knowing whether the surgical instrument is in, or simply near, the skull, it may be accidental.

*Voinovich,* 911 F.Supp. at 1066 (footnote omitted).

After reviewing the foregoing descriptions of the various abortion methods, the Court is unpersuaded by the Plaintiffs' argument that HB 351 imposes an undue burden on a woman's right to obtain a pre-viability abortion by banning the widely performed D & E procedure. In reaching this conclusion, the Court notes a critical distinction between HB 351 and HB 135, which represented Ohio's unsuccessful 1995 attempt to ban D & X abortions. As noted, *supra,* HB 135 defined the banned D & X procedure as the purposeful insertion of a suction device into the skull of a fetus to remove the brain. Upon review, this Court concluded that the D & X *and* D & E techniques described above *both* frequently involved such a process. Consequently, the Court found that HB 135 effectively banned the D & E procedure. Given that the D & E procedure is the most widely used and, by many accounts, the safest method of terminating a pregnancy after the first trimester, the Court held that HB 135's ban on that procedure was unconstitutional.

As the Court has explained, HB 351 takes a different approach. The Act prohibits what it describes as the "partial birth procedure." Although the phrase "partial birth procedure" is not defined in medical literature, the Act provides its own statutory definition. In particular, the "partial birth procedure" is defined as "the medical procedure that includes all of the following elements in sequence:"

(a) intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

(b) in a breach presentation, *intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;*

(c) intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

(d) completion of the vaginal delivery of the fetus.

Ohio Rev.Code § 2919.151(A)(3) (emphasis added).

A review of the foregoing language persuades the Court that HB 351 does not sweep in the commonly used D & E method of abortion. Unlike HB 135, which this Court found to be unconstitutional, HB 351 distinguishes between *intact* fetuses and *non-intact* fetuses. As it did in *Voinovich,* the Court finds, based on largely the same evidence, that "[t]he primary distinction between [the] D & X procedure and the D & E procedure ... appears to be that, whereas the D & E procedure results in dismemberment and piece-by-piece removal of the fetus from the uterus ... the D & X procedure results in a fetus which is removed basically intact...." *Voinovich,* 911 F.Supp. at 1066. Indeed, as the Court previously found, "[t]he hallmark of the D

& X procedure ... is that the fetus is removed intact, rather than being dismembered prior to removal, as is done in a D & E procedure." *Id.*

As set forth above, the "partial birth procedure" banned by HB 351 involves, *inter alia,* "the intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother[.]" Based upon the evidence now before it (which includes much of the same evidence that it reviewed in 1995), the Court finds that, as commonly practiced, the D & E method of abortion *does not* involve "the intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother[.]"[22] Rather, the D & E procedure typically involves "the use of forceps and/or crushing instruments for dismem-

berment of the fetus and *removing the fetus in parts,*" (Pl. Exh. 26 at 48; *see also* Pl. Exh. 22 at 126).

▮ In contrast to the D & E, the Court finds that the D & X procedure typically involves the removal of an intact or nearly intact fetus in much the same manner described by HB 351. The Court recognizes, however, that the banned "partial birth procedure" is not identical to the D & X procedure defined by ACOG. Nor is the banned "partial birth procedure" identical to the D & X variant ("intact D & E") performed by Plaintiff Haskell.[23] The critical question, however, is not whether HB 351 bans the *exact* procedure defined by ACOG or the *exact* procedure performed by Plaintiff Haskell. Rather, the crucial inquiry is whether HB 351 imposes an undue burden on a woman's ability to obtain a pre-viability abortion by banning the D & E, the most commonly used method for performing a second trimester abortion. Based upon the record before it, the Court finds that the banned "partial birth procedure" does *not* encompass the D & E procedure, at least as it (the D & E) is typically performed.[24] As a result, HB

22. By specifically defining the portion of a fetus that must be delivered intact to constitute a violation of the law, HB 351 avoids a primary problem identified by the Supreme Court in *Carhart.* As noted, *supra,* the Nebraska statute at issue in *Carhart* prohibited "deliberately and intentionally delivering into the vagina a living unborn child, *or a substantial portion thereof . . . .*" *Carhart,* 120 S.Ct. at 2613 (emphasis added). Upon review, the *Carhart* Court noted "that D & E will often involve a physician pulling a 'substantial portion' of a living fetus, say, an arm or a leg, into the vagina prior to the death of the fetus." *Id.* Consequently, the Supreme Court found itself unable to distinguish "between D & E (where a foot or arm is drawn through the cervix) and D & X (where the body up to the head is drawn through the cervix)." *Id.* Unlike the Nebraska legislature, however, the Ohio legislature has precisely defined the portion of the living fetus that must be delivered intact before a violation will occur.

23. Although Plaintiff Haskell now refers to his procedure as an "intact D & E" rather than a "D & X," the Court concludes, as did the Supreme Court in *Carhart,* that the two terms

have essentially the same meaning and may be used interchangeably.

24. The Court notes its reluctance to label a various method of abortion as a "D & E," "D & X," or "intact D & E" procedure, given the absence of a universally recognized definition for these terms, which have slightly different meanings, even among physicians. Rather, the most accurate way to discuss a particular method of abortion is to identify the specific actions involved in performing it. Thus, in concluding that Ohio's ban on the "partial birth procedure" does not impose an undue burden on a woman's ability to undergo the "D & E" procedure, the Court wishes to clarify the meaning of that finding. In particular, the Court finds, based upon the evidence discussed more fully above, that what has been referred to as a "D & E" abortion typically involves at least some dismemberment of the fetus before it is removed from a woman's body to the point described in HB 351 (*i.e,* "extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body

351, unlike its predecessor, does not impose an undue burden on a woman's right to obtain a pre-viability abortion by banning the widely performed D & E procedure.[25] In short, the Plaintiffs have not shown a substantial likelihood of establishing that, in a large fraction of the relevant cases,[26] Ohio's ban on the "partial birth procedure" has the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonvi-

able fetus,"[27] based upon their argument that the Act impermissibly sweeps in the D & E procedure.

b. *Adequacy of Health Exception to HB 351's Pre–Viability Ban on "Partial Birth Procedure"*

■ In a second argument, the Plaintiffs contend that HB 351 is unconstitutional, insofar as it prohibits the pre-viability performance of the "partial birth

---

of the mother"). Given that those abortions do not involve the delivery of an "intact" fetus to the point described in HB 351, they do not violate the statute, and the statute, therefore, does not impose an undue burden on the ability of a woman to utilize the most common second-trimester abortion procedure. In opposition to this conclusion, the Plaintiffs have argued that a "D & E" abortion *may* involve the delivery of a living, intact fetus up to the head. Based upon the definitions utilized by the Court herein, however, such an abortion is, by definition, a "D & X" (or a variant thereof), and not a traditional "D & E." In any event, as the Court has explained, the critical question is not the particular "label" one adopts. Rather, the critical question, for purposes of the Court's analysis herein, is whether HB 351 bans a *method* of abortion that is used by the vast majority of women in Ohio to abort a pregnancy during the second trimester. For the reasons set forth more fully above, the Court concludes that the Act does not.

**25.** In reaching this conclusion, the Court finds no merit in the Plaintiffs' suggestion that HB 351 is unconstitutionally "vague," because it fails to define the phrases "dilation and evacuation," "dilation and extraction," and "intact fetus." As set forth above, the Act expressly excludes from its reach the "suction curettage procedure of abortion," the "suction aspiration procedure of abortion," and the "dilation and evacuation procedure of abortion." Ohio Rev.Code § 2919.151(F). In addition, the Act provides that the "dilation and evacuation procedure of abortion does not include the dilation and extraction procedure of abortion." Ohio Rev.Code § 2919.151(A)(1). The legislature's failure to define the foregoing phrases certainly renders them less helpful than they otherwise might have been. If the Act's definition of the banned "partial birth procedure" was itself vague or unclear, the legislature's failure to define various procedures that are not prohibited might be troublesome. Once again, however, the critical issue is whether it is possible to identify the particular procedure that HB

351 *does* ban. After reviewing the definition of the banned four-step "partial birth procedure" set forth in 2919.151(A)(3), the Court finds nothing vague or ambiguous about its meaning. To the contrary, the prohibited procedure is well defined. Given that the definition of the banned "partial birth procedure" is clear, the Court finds little significance in the fact that the legislature failed specifically to define the various procedures that are not banned.

Finally, with respect to the Plaintiffs' contention that term "intact" is itself ambiguous, the Court finds this contention to be unpersuasive. "When the common meaning of a word provides both adequate notice of the conduct prohibited and standards for enforcement, a statute's failure to define a term will not render the statute unconstitutionally void for vagueness." *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir.1996). The word "intact" is commonly understood in the English language. It has been defined to mean "left complete or entire," "physically and functionally complete," and "having no relevant component removed or destroyed." *Webster's Third New International Dictionary* (unabridged) 1173 (1976). Given that the term "intact" has a commonly accepted meaning, an ordinary person performing an abortion would be able to recognize whether a particular fetus is or is not "intact."

**26.** *See Voinovich*, 130 F.3d at 194 (quoting *Casey* and recognizing that an abortion law is unconstitutional on its face if, " 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion' ").

**27.** *See Carhart*, 120 S.Ct. at 2604 (noting that the phrase "undue burden" is "shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus").

procedure," because it lacks an adequate exception for the health of the woman. Although HB 351 generally prohibits a woman from undergoing the "partial birth procedure," it does provide an exception when either her life or health is at risk. Specifically, the Act prohibits the partial birth procedure, unless it is "necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(C). The Act defines the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

In support of their Motion for a Preliminary Injunction, the Plaintiffs contend that the foregoing exception is unconstitutional because, among other things, it is limited to a medically diagnosed *condition* that complicates a woman's pregnancy. They insist that the Act's health and life exception must allow the "partial birth procedure" not only when a medically diagnosed condition makes that method of abortion necessary, but also when that *procedure* is simply safer than any other alternative. In particular, they contend that "a health and life exception may not be limited only to those conditions that relate to pregnancy [or the pregnancy itself], but must instead be encompassing of all possible conditions that could potentially threaten the overall health or life of a woman, *including the choice of abortion procedure.*" (Doc. # 2 at 21) (emphasis added). In response, the Defendants essentially advance two arguments. *First,* they contend that the State of Ohio is not required to grant physicians unfettered discretion to choose their favorite abortion procedure. *Second,* they assert that the health exception in HB 351 is constitutional, because it covers "any medically diagnosed condition," and not just complications of the pregnancy itself. (*See, e.g.,* Doc. # 12 at 16–20, 24–25).

█ Upon review, the Court finds the Supreme Court's recent ruling in *Carhart* to be dispositive. As noted, *supra,* the *Carhart* Court reaffirmed the principle that a "State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart,* 120 S.Ct. at 2609. As a result, a statute regulating a method of abortion must include an exception " 'where it is necessary in appropriate medical judgment for the preservation of the life or health of the mother[.]' " *Id.* (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). As this Court has explained, the *Carhart* majority expressly rejected the proposition that a health exception need only cover situations in which a woman's pregnancy itself creates a threat to her health.[28] *Id.* Rather, the Court explained:

[o]ur cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's health is the same whether it happens to arise from regu-

---

**28.** As noted, *supra,* the *Carhart* majority disagreed with Justice Thomas on this point, stating:

Justice THOMAS says that the cases just cited limit this principle to situations where the pregnancy *itself* creates a threat to health. *See post,* at 2651. He is wrong. The cited cases, reaffirmed in *Casey,* recognize that a State cannot subject women's health to significant risks both in that context, *and also* where state regulations force women to use riskier methods of abortion. Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely. Our holding does not go beyond those cases, as ratified in *Casey. Carhart,* 120 S.Ct. at 2609.

lating a particular method of abortion, or from barring abortion entirely....

*Id.*

The *Carhart* Court also adopted a broad reading of the phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 2612. As noted, *supra*, the Court reasoned that the phrase

cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey's* words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion....

*Id.* at 2612.

In light of *Carhart*, the Court finds the Defendants' two arguments to be unpersuasive. With respect to the Defendants' argument that physicians do not enjoy "unfettered discretion" to select their abortion method of choice, the Court does not disagree. *See id.* at 2613. Indeed, if the record supports the proposition that the banned "partial birth procedure" is *never* "safer" than other alternatives, then the State of Ohio may, quite obviously, ban that procedure, without providing an exception for circumstances in which it is safer than other methods of abortion. However, if substantial medical authority supports the proposition that banning the partial birth procedure could endanger women's health by subjecting them to more risky procedures, then *Carhart* requires HB 351 to include a health exception allowing the procedure to be performed in such cases. *Id.* at 2612–2613. With respect to the Defendants' alternative argument that the health exception in HB 351 is constitutional, because it covers "any medically diagnosed condition," and

not just complications of the pregnancy, their argument simply misses the point. The Defendants appear to suggest that the Act would allow the "partial birth procedure" to be performed when any health condition complicates a woman's pregnancy, regardless of whether the pregnancy caused the health condition. For example, the Court perceives the Defendants' argument to be that HB 351 would permit a "partial birth procedure" if (a) pre-eclampsia or some other complication of pregnancy endangered her health, *and* if (b) a form of cancer wholly unrelated to the pregnancy endangered her health. Although the Defendants' argument may be true, it fails to address *Carhart's* recognition that any prohibition against a particular method of abortion must include an exception allowing the banned procedure to be performed "when it may bring with it greater safety for some patients[.]" *Carhart*, 120 S.Ct. at 2613.

Having rejected the Defendants' arguments, the Court next must review HB 351 to determine whether its health exception does permit the "partial birth procedure" to be performed when it is safer than any alternative. As noted above, the Act allows the banned "partial birth procedure" to be performed only if a woman's life or health is endangered by a "serious risk of the substantial and irreversible impairment of a major bodily function,"[29] which means

any *medically diagnosed condition* that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(A)(5) (emphasis added).

A plain reading of the foregoing language reveals that it lacks the health exception discussed in *Carhart*. The Act allows the "partial birth procedure" to be performed whenever a medically diagnosed condition so complicates a woman's

---

**29.** *See* Ohio Rev.Code § 2919.151(C).

pregnancy that it threatens the substantial and irreversible impairment of a major bodily function. Notably absent from HB 351 is language allowing the "partial birth procedure" to be performed in cases where the medical evidence shows that it is simply the safest method of abortion. In light of this omission, the critical issue is whether the record contains medical evidence to support the proposition that the "partial birth procedure" may provide greater safety for some women. *Carhart,* 120 S.Ct. at 2613. Consequently, the Court will now examine the record to determine whether, in some cases, the "partial birth procedure" may be the safest means of terminating a pregnancy (*i.e.,* safer than any available alternative).

In support of their Motion for a Preliminary Injunction, the Plaintiffs argue at length that the D & X method of abortion frequently poses less health risks than the traditional D & E, which involves dismemberment, and the other procedures discussed, *supra.* Based upon its review of the record, the Court finds this argument to be persuasive. In *Voinovich,* this Court had the opportunity to compare the D & X to the D & E and other methods of abortion and concluded that the D & X involved less risk to maternal health than other second trimester procedures:

After viewing all of the evidence, and hearing all of the testimony, this Court finds that use of the D & X procedure in the late second trimester appears to pose less of a risk to maternal health than does the D & E procedure, because it is less invasive-that is, it does not require sharp instruments to be inserted into the uterus with the same frequency or extent-and does not pose the same degree of risk of uterine and cervical lacerations, due to the reduced use of forceps in the uterus, and due to the removal of any need to crush the skull and remove it in pieces, which can injure maternal tissue.

This Court also finds that the D & X procedure appears to pose less of a risk to maternal health than the use of induction procedures, which require the woman to go through labor, pose additional risks resulting from the injection of fluids into the mother, and cannot be used for every woman needing an abortion.

Finally, the Court finds that the D & X procedure appears to pose less of a risk to maternal health than either a hysterotomy or a hysterectomy, both of which are major, traumatic surgeries. *Voinovich,* 911 F.Supp. at 1070.

After considering largely the same evidence in the present case, the Court reaches the same conclusion herein. The safety advantages of the D & X over other methods of abortion are both intuitive and well supported by the record. The evidence persuades the Court that the D & X procedure appears to have a number of health and safety advantages over the D & E. Since the D & X method involves the extraction of an intact fetus, it requires fewer instruments to be inserted into the uterus. This results in a lower risk of infection, less blood loss, and a smaller chance of causing trauma to the cervix. (Tr. 9–5–2000 at 39–40; Pl. Exh. 32 at ¶ 10¢—11; Def. Exh. L at 72, 76–78). It also reduces the possibility of a physician leaving fetal tissue inside the uterus. (Def. Exh. L at 78). Likewise, the D & X procedure appears to have health and safety advantages over the other abortion techniques. Unlike induction/instillation, the D & X procedure does not require the injection of a saline-type fluid, which may lead to serious medical complications, including amniotic fluid embolus or disseminated intravascular coagulation.[30] (Pl. Exh. 20 at 25). In addition, unlike induction/instillation, the D & X procedure does not require a woman to undergo an ex-

---

**30.** Amniotic fluid embolus, which is usually fatal, results from the injected fluids being introduced into a woman's circulation. (Pl. Exh. 20 at 25). Disseminated intravascular coagulation is a condition in which foreign proteins enter a woman's immune system, resulting in spontaneous bleeding. (*Id.;* Pl. Exh. 18 at 45).

tended period of labor. (Pl. Exh. 18 at 42; Pl. Exh. 20 at 25). The D & X method of abortion is also much less traumatic than a hysterotomy or a hysterectomy, both of which are major surgical procedures. (Pl. Exh. 18 at 46; Pl. Exh. 20 at 23). Finally, the American College of Obstetricians and Gynecologists has recognized that the D & X procedure "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman...." (Def.Exh. B).

In short, the Court concludes, as it did in *Voinovich*, that the D & X procedure appears to have a number of health and safety advantages over other methods of abortion, including the widely performed D & E procedure. As the parties have recognized, however, this conclusion does not completely resolve the issue before the Court. While the D & X procedure, which involves delivery of an intact fetus, may have various health and safety advantages over the D & E, which involves dismemberment, the Defendants properly note that HB 351 *does not* prohibit a physician from partially delivering an intact fetus. Rather, it prohibits the partial delivery of a *living*, intact fetus.[31] As set forth above, *step two* in the sequential four-step "partial birth procedure" banned by HB 351 requires, "in a breech presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother[.]" Ohio

Rev.Code § 2919.151(A)(3)(b). Although the foregoing language does not specify that the fetus must be alive, *step three* requires "intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus[.]" Ohio Rev.Code § 2919.151(A)(3)(c). Read together, steps two and three demonstrate that the intact fetus must be *alive* when it is extracted from the body of the mother to the point proscribed by § 2919.151(A)(3)(b). As a result, if a physician delivered an intact, but dead, fetus from the body of the mother, the physician would not violate the Act. Consequently, the Court next must determine whether the record contains medical evidence to support the proposition that performing the "partial birth procedure," which requires the partial delivery of a *live* fetus, may provide greater safety for some women than requiring a doctor to abort an intact, but *dead*, fetus.[32]

In opposition to the Plaintiffs' Motion for a Preliminary Injunction, the Defendants have identified two ways that a doctor could cause fetal demise before performing a D & X, and thereby avoid liability under the Act. *First*, the Defendants have suggested that a doctor might

---

**31.** The Court notes that the term "alive" is not synonymous with the term "viable." In order for a fetus to be considered "viable" under HB 351, there must be "a realistic possibility of maintaining and nourishing [its] life outside the womb with or without temporary artificial life-sustaining support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(C)(ii). Therefore, a fetus may be alive, but not viable, if it lacks a realistic possibility of maintaining life outside the mother. As noted, *supra*, however, the Act prohibits the "partial birth procedure" without respect to the viability or non-viability of the fetus.

**32.** The Court notes that its references herein to the "partial delivery" of a "live fetus" are used in the context of Ohio Revised Code § 2919.151(A)(3)(b). As noted, *supra*, that provision requires "in a breech presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother[.]"

inject a substance known as digoxin into the fetus in utero. This procedure, which involves an injection through a woman's abdomen, causes the fetus to die within thirty minutes or less. (Tr. 9–6–2000 at 40; Def. Exh. L at 27). *Second*, the Defendants contend that a doctor might sever the umbilical cord at the outset of a D & X procedure and wait for the fetus to die before removing it intact. Plaintiff Haskell testified that he routinely severs the umbilical cord near the beginning of a D & X abortion. (Tr. 9–6–2000 at 32–34). He also confirmed that he could sever the umbilical cord and wait for fetal demise before even starting the D & X procedure, thereby avoiding liability under HB 351. (*Id.* at 34–35). According to Haskell, severing the umbilical cord would cause the fetus to die within approximately fifteen to thirty minutes. (*Id.*).

Upon review, however, the Court finds that neither of the foregoing options provides any benefit to a woman, and both options involve some increased risk to her health. Aside from the pain associated with the injection, the use of digoxin to cause fetal demise has been acknowledged to involve some health risks to a pregnant woman. Dr. Nancy Romer, a witness for the Defendants, testified that digoxin may cause arrhythmia if it is inadvertently injected into a woman's bloodstream. (Def. Exh. L at 29–30, 94). Likewise, Plaintiff Haskell testified that the risks of a digoxin injection include the possibility of puncturing a blood vessel that continues to bleed internally, or puncturing "a loop of a valve that could get in the way of the needle." (Tr. 9–5–2000 at 73).

The option of severing the umbilical cord and waiting up to thirty minutes for the fetus to die before performing a D & X abortion also increases the risk to a woman's health. The record reveals that, following dilation (which usually occurs over one or two days), the D & X procedure itself generally takes no more than twenty minutes to complete. (Pl. Exh. 32 at ¶ 12; Pl. Exh. 20 at 33). As a result, requiring a physician to cut the umbilical cord and to wait up to thirty minutes before proceeding further would more than double the length of the procedure, without providing any benefit to the woman. Although Plaintiff Haskell typically performs the D & X procedure with local anesthesia (Tr. 9–5–2000 at 29; Tr. 9–6–2000 at 54), he noted that some doctors use general anesthesia. (Tr. 9–5–2000 at 29). In fact, Dr. John Doe, who is one of four doctors in Ohio utilizing the D & X procedure (Tr. 9–5–2000 at 59), has explained that he uses general anesthesia to perform it. (Pl. Exh. 30 at 44, 81). Dr. Doe has testified, and the Court finds, that the risk to a woman's health is generally greater the longer she is under general anesthesia.[33] (Pl.Ex. 30 at 44). The Court also notes that the use of general anesthesia is associated with various risks, including the possibility of aspiration and vomiting, which may cause a woman to stop breathing. (Pl. Exh. 18 at 46). Consequently, the Court finds, based on the evidence before it, that the risk of harm to a woman's health increases the longer she remains under general anesthesia.[34]

**33.** Dr. Doe explained that the D & X procedure is quicker than the D & E and that it decreases the time that a woman is under general anesthesia. (Pl. Exh. 30 at 44). He considers this to be an advantage of the D & X. (*Id.*).

**34.** The Court notes that "[t]he goal of general anesthesia is to modify cerebral function. As a side effect, most anesthetics depress the cardiovascular and respiratory systems. If not amended, anesthetic depression can progress to circulatory or respiratory arrest. In a sense, general anesthesia entails continuous resuscitation during ongoing administration of potentially lethal drugs." Dripps, Eckenhoff & Vandam, *Introduction to Anesthesia, The Principles of Safe Practice* at 70 (7th ed.1988). In light of the effect that anesthesia has on the cardiovascular and respiratory systems, it is axiomatic that the risk to a woman's health increases the longer she remains under its influence. *See also* Hardy, *Rhoads Textbook of Surgery* at 447 (5th ed.1977) (recognizing that "postanesthesia complications are directly related to the length of the operation").

In light of the risks identified above, the Court concludes that the "partial birth procedure," which involves the partial delivery of a *live* fetus, may provide greater safety for some women than requiring a physician to ensure fetal demise before performing an abortion. Indeed, the evidence in the record supports the proposition that banning the "partial birth procedure" could endanger women's health by subjecting them to more risky procedures. As a result, the State of Ohio cannot ban the "partial birth procedure," without providing a health exception for circumstances in which that procedure is safer than requiring a physician to inject digoxin or to cut the umbilical cord and to wait up to thirty minutes to guarantee that the fetus is dead. *Carhart*, 120 S.Ct. at 2609 (recognizing that "a State may promote but not endanger a woman's health when it regulates the methods of abortion"). Given that the health exception in HB 351 does not account for such circumstances, the Court concludes that the Plaintiffs have demonstrated a substantial likelihood of success with respect to their argument that the Act is unconstitutional under *Car-*

*hart*, insofar as it limits a woman's ability to obtain a pre-viability abortion.[35]

This conclusion is consistent with case law from other jurisdictions. For example, in *Carhart* itself, the district court rejected an argument that Nebraska's ban on "partial birth abortions" did not impose an undue burden, because physicians could ensure fetal demise before performing the procedure. *Carhart v. Stenberg*, 972 F.Supp. 507, 527–528 (D.Neb.1997). In so doing, the district court specifically discussed, and rejected, the options of causing fetal demise in utero with an injection or cutting the umbilical cord and awaiting fetal demise before continuing with an abortion. The district court concluded that both options resulted in appreciable maternal health risks without a corresponding benefit to the woman. *Id.; see also Evans v. Kelley*, 977 F.Supp. 1283, 1301 (E.D.Mich.1997) (discussing the use of digoxin and the possibility of severing the umbilical cord and concluding that any attempt to ensure fetal demise before beginning an abortion would require additional procedures with potential health risks and no benefit to the woman);

**35.** In opposition to the Court's conclusion that the health exception in HB 351 is likely unconstitutional, the Defendants stress that it includes language that is similar to language upheld as constitutional in *Casey*. Although the Court does not dispute this observation, the issue in the present case is quite different than the issues raised in *Casey*, which involved several provisions of the Pennsylvania Abortion Control Act. Among other things, that legislation included informed consent provisions and imposed a twenty-four hour waiting period. These requirements applied unless a "medical emergency" existed. The Pennsylvania statute defined a "medical emergency" as:

> [t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate termination of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Casey*, 505 U.S. at 879, 112 S.Ct. at 2822 (quoting 18 PA. CONS.STAT. § 3203 (1990)).

Unlike the present case, *Casey* did not deal with a statute that banned a *method* of abortion. Rather, as the Court has noted, the statute in *Casey* included consent provisions and imposed a waiting period. When viewed in the context of those limited restrictions, the Supreme Court concluded that Pennsylvania's health exception was sufficient. Thereafter, however, the Supreme Court made clear in *Carhart* that when a State proscribes a particular abortion procedure, it must include an exception, allowing the banned procedure to be performed when it is safer than any alternative method of abortion. *Carhart*, 120 S.Ct. at 2609. Indeed, when a State bans a particular abortion procedure, the *Carhart* Court expressly rejected the proposition that a health exception may be limited to situations in which a physical condition complicates a woman's pregnancy. *Id.* Given that *Casey* did not involve the issue discussed in *Carhart*, and raised in the present case, the fact that *Casey* found Pennsylvania's health exception to be constitutional is not controlling herein, despite the similarity in statutory language.

*Planned Parenthood of Central New Jersey v. Verniero,* 41 F.Supp.2d 478, 500 (D.N.J.1998) (recognizing that requiring a physician to ensure fetal demise by injecting digoxin or severing the umbilical cord would involve increased risks to the woman and would result in an undue burden), *aff'd* 220 F.3d 127 (3rd Cir.2000).[36]

Based on the reasoning and citation of authority set forth above, the Plaintiffs have shown a substantial likelihood of success with respect to their argument that HB 351 is unconstitutional, insofar as it prohibits a woman from undergoing a pre-viability "partial birth procedure."[37] That finding, however, does not end the Court's inquiry. While Ohio Revised Code § 2919.151(C) bans the *pre-viability* performance of the "partial birth procedure," a separate provision, § 2919.151(B), bans the *post-viability* performance of that procedure. For the reasons set forth more fully, *supra,* the Plaintiffs have made a substantial showing that § 2919.151(C) is likely unconstitutional.

Given that divisions (B) and (C) of § 2919.151 are written separately, however, the Defendants argue that division (C), the pre-viability ban, may be severed from the Act. The issue of severance is a question of state law. *Voinovich,* 130 F.3d at 202. Although HB 351 does not contain a severability provision, statutory provisions are presumed to be severable under Ohio law:

If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

Ohio Rev.Code § 1.50.

In order to determine whether an unconstitutional provision may be severed under Ohio law, the Court must consider the following questions:

"(1) Are the constitutional and the unconstitutional parts capable of separation so that each may read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?"

*Voinovich,* 130 F.3d at 202 (quoting *State ex rel. Maurer v. Sheward,* 71 Ohio St.3d 513, 644 N.E.2d 369, 377 (1994), and *Geiger v. Geiger,* 117 Ohio St. 451, 160 N.E. 28, 33 (1927)).

After reviewing the foregoing considerations, the Court concludes that Ohio Revised Code § 2919.151(C) is capable of being severed from the remainder of the Act. As noted, *supra,* divisions (B) and (C) of the Act are written separately and

**36.** The Court is aware of its previous suggestion in *Voinovich,* 911 F.Supp. at 1075, that the State might be able to regulate the D & X procedure by requiring a physician to cut the umbilical cord and to wait for the fetus to die. That statement, however, was plainly *dicta.* In any event, in light of *Carhart* and the evidence in the record, the Court's prior suggestion has proven to be inadequate, as it impermissibly increases the risk to a woman's health.

**37.** In addition to arguing that the pre-viability health exception in HB 351 is unconstitutional, because it fails to permit the "partial birth procedure" to be performed when said procedure is safer than the alternatives, the Plaintiffs also argue that the pre-viability health exception is unconstitutional, because it is limited to *physical* health conditions. In other words, the Plaintiffs argue that a woman must be permitted to undergo a pre-viability "partial birth procedure" when that method of abortion is necessary to preserve her *mental* health. The Court need not resolve this argument, given its determination that HB 351 is likely unconstitutional, in the pre-viability context, for another reason, namely its failure to allow the "partial birth procedure" to be performed when that technique is the safest means of terminating a pregnancy.

stand independent of one another. Furthermore, it is not impossible to give effect to division (B) with division (C) stricken, and the Court finds no need to insert words to give effect to only division (B). Finally, given that divisions (B) and (C) are set forth separately, it appears that the Ohio General Assembly has indicated an intent to ban the *post-viability* performance of the "partial birth procedure" as opposed to imposing no ban at all. Consequently, the Court must now consider the constitutionality of HB 351, insofar as it bans the "partial birth procedure" post-viability.[38]

### 2. *Constitutionality of HB 351 After Fetal Viability*

Given that division (C) is severable from the remainder of HB 351, the Court turns now to division (B), which prohibits the "partial birth procedure" to be performed when a fetus is viable. With respect to division (B), the Court must consider whether that portion of the Act is likely to survive the Plaintiffs' facial challenge to its constitutionality. As noted, *supra*, the Court's analysis of this question will focus on two issues: (1) whether the Act's post-viability ban on the "partial birth procedure" contains a sufficient exception for the health of the woman; and (2) whether the Act contains an adequate "scienter" requirement.[39]

### a. *Adequacy of Health Exception to HB 351's Post–Viability Ban on "Partial Birth Procedure"*

The health exception contained in HB 351 is the same, regardless of the viability of the fetus. As noted, *supra*, the Act bans the "partial birth procedure," unless it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(B). As the Court has explained, this exception applies only when "any medically diagnosed condition ... so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

For the reasons set forth more fully above, the foregoing exception is constitutionally infirm, in the pre-viability context, because it does not permit a physician to perform the partial birth procedure when

---

**38.** In opposition to the Court's conclusion that HB 351 is severable, the Plaintiffs suggest that severance is impossible, because the Act violates Ohio's "one-subject rule." The Court finds this argument to be meritless. The one-subject rule derives from Article II of the Ohio Constitution. It provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title." *See State ex rel. Ohio Academy of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, 1097 (1999). The one-subject rule " 'attacks logrolling by disallowing unnatural combinations of provisions in acts....' " *Id.* at 1098 (quoting *State ex rel. Dix v. Celeste,* 11 Ohio St.3d 141, 464 N.E.2d 153 (1984)). The one-subject rule " 'is not directed at plurality but at disunity in subject matter.' " *Id.* at 1099. Consequently, a piece of legislation may address more than one topic, provided that " 'a common purpose or relationship exists between the topics.' " *Id.* (quoting *Hoover v. Bd. of Commrs., Franklin County,* 19 Ohio St.3d 1, 482 N.E.2d 575 (1985)). In the present case, the key provi-

sions of HB 351 share a common purpose and relationship. As the Court has explained, Ohio Revised Code § 2919.151(B) prohibits the "partial birth procedure" when a fetus is viable, whereas § 2919.151(C) prohibits the same procedure when a fetus is not viable. Finally, § 2919.151(D) creates the crime of "partial birth feticide" for violations of the ban on the "partial birth procedure," and § 2307.53(B) provides for civil liability if the procedure is performed unlawfully. The foregoing provisions involve the same general topic and bear a close relationship to one another. Given that HB 351 does not address a "disunity of topics," Ohio's one-subject rule has not been violated. *Sheward,* 86 Ohio St.3d at 496–497, 715 N.E.2d at 1099.

**39.** The Defendants' have raised their "scienter" arguments with respect to HB 351 as a whole (*i.e.,* insofar as it applies both pre-viability and post-viability). For reasons which will become apparent, *infra*, the Court has elected to address the scienter issue in the post-viability portion of its decision.

it is less risky than any alternative method of abortion. *Carhart*, 120 S.Ct. at 2609, 2612–2613. In other words, in the pre-viability context, a health exception to a statute proscribing a method of abortion must contain two separate components: (1) the banned procedure must be allowed when it is necessary as a result of a medically diagnosed condition; and (2) the banned procedure must be allowed when it is safer than other methods of abortion.[40]

Given that *Carhart* only addressed the health exception issue in the pre-viability context,[41] the Court must determine the implication of that ruling with respect to Ohio Revised Code § 2919.151(B), which prohibits the post-viability performance of the "partial birth procedure," subject to the exception set forth above. In resolving this issue, the Court begins with the well-recognized premise that " 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, *and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*' " *Casey*, 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–165, 93 S.Ct. 705) (emphasis added).

Given that the State of Ohio may ban post-viability abortions outright, except where necessary to preserve the life or health of the mother, the two-part health exception identified above must be analyzed in slightly different fashion in the post-viability context. If a State generally may prohibit *all* abortions after a fetus has attained viability, it is incongruous to say that, in the absence of health considerations, an exception must be made whenever one method of abortion is "riskier" than another. In other words, if a health

condition does not require a woman to undergo a post-viability abortion, then a State may prohibit her from doing so, period, by any method. The comparative "safety" of one method of abortion over another is simply immaterial, *unless and until* a woman establishes that some health condition requires the termination of her pregnancy. Once a woman who is carrying a viable fetus *does* demonstrate that a health condition requires her to terminate the pregnancy, however, she must be permitted to choose the least risky method. This is so because "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart*, 120 S.Ct. at 2609. Indeed, it would be irrational to say that any woman who desires an elective abortion in the pre-viability context must be allowed to choose the least risky method available, whereas, in the post-viability context, the State may subject a woman who requires an abortion for health reasons to more deleterious procedures.

The conclusion drawn from the foregoing analysis is that HB 351 fails to provide an adequate health exception in the post-viability context. Although the Act may appear to meet the foregoing requirements, this is manifestly not the case. HB 351 bans the "partial birth procedure" in the post-viability context, unless it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(B). The Defendants have represented to the Court that this exception is limited to *physical* conditions that "so complicate[ ] the pregnancy of the woman

---

**40.** In the pre-viability context, the second exception is only required where, as in the present case, medical evidence supports the proposition that, in some instances, the banned procedure is safer than other alternatives. *Carhart*, 120 S.Ct. at 2610.

**41.** In *Carhart*, the district court noted that the plaintiff ordinarily performed the banned

"partial birth" procedure only between the sixteenth and twentieth weeks of pregnancy, before the fetus was viable. *Carhart v. Stenberg*, 972 F.Supp. 507, 523 (D.Neb.1997). Consequently, his "as applied" challenge to the constitutionality of the Nebraska statute did not extend to the post-viability portion of the law. *Id.*

as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function."[42] Ohio Rev.Code § 2919.151(A)(5). The Court agrees with this candid representation, particularly in light of the fact that the language at issue is very similar to the language employed in HB 135, which both this Court and the Sixth Circuit found to cover only physical conditions.

Inasmuch as HB 351 permits women with *physical* health conditions to undergo the "partial birth procedure," it may appear to survive the constitutional analysis set forth above, but it does not. This Court has recognized that, in the post-viability context, the State may proscribe abortion altogether, except when it is necessary to save the life or health of the woman. *Casey*, 505 U.S. at 879, 112 S.Ct. 2791. Furthermore, as this Court has explained, logic dictates that when a physical health problem requires a woman to undergo a post-viability abortion, she must be permitted to use the least risky procedure, even if it is the "partial birth procedure."

Under Ohio Revised Code § 2919.151(B), when a *physical* health condition so complicates a woman's pregnancy that she must use the "partial birth procedure," she is permitted to do so. As set forth above, the Act provides that "no person shall knowingly perform a partial birth procedure on a pregnant woman *when the procedure is not necessary,* in reasonable medical judgment, to preserve the life or health of the mother . . . ." Ohio Rev.Code § 2919.151(B) (emphasis added). Insofar as § 2919.151(B) *permits* the "partial birth procedure" to be performed post-viability, when that procedure is necessary to preserve a woman's physical health, the Act survives the constitutional analysis set forth above.

As the Court has explained, however, once a physical condition places a woman's health at risk, she *also* must be permitted to undergo the "partial birth procedure," if it is simply safer than other alternatives. In other words, if a physical condition makes a post-viability abortion necessary (but does not specifically make the "partial birth procedure" necessary), a woman still must be permitted to undergo the banned "partial birth procedure." This is so because "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart,* 120 S.Ct. at 2609. HB 351 does not contain a provision allowing a woman to undergo the "partial birth procedure," post-viability, when she has a serious physical health problem and the banned procedure, as opposed to an abortion generally, while not absolutely necessary, is the safest method of terminating her pregnancy. Absent such an exception, the Court finds a substantial likelihood that Ohio Rev.Code § 2919.151(B) is unconstitutional.

The Act also appears to be constitutionally infirm, insofar as it applies to women who are required to undergo a post-viability abortion due to serious *mental health* conditions. In *Voinovich,* the Sixth Circuit held that a State must permit a woman to have a post-viability abortion, when it is necessary to prevent a serious, non-temporary threat to her mental health. *Voinovich,* 130 F.3d at 209–210. Given that a State cannot prohibit a woman from aborting a viable fetus to preserve her own psychological or emotional health, it follows naturally from *Carhart* that she cannot be deprived of the safest method of doing so. Indeed, just as a woman who is suffering from a serious *physical* health condition must be permitted to undergo the safest abortion procedure available, a woman who is suffering from a *mental*

---

42. Indeed, the Defendants insist in their memoranda that *no* mental health exception is necessary. They have not suggested that HB 351 should be construed as encompassing a mental health exception. *See* "Memorandum Contra of Defendants, Governor Bob Taft and Attorney General Betty D. Montgom- ery, to Plaintiffs' Motion for Preliminary Injunction" (Doc. # 12 at 20–24); "Post–Hearing Memorandum of Defendants, Governor Bob Taft and Attorney General Betty D. Montgomery, in Opposition to Plaintiffs' Motion for Preliminary Injunction" at 11–12.

health condition of the type described by this Court in *Voinovich* [43] is entitled to no less.

In opposition to this conclusion, the Defendants insist that the "partial birth procedure" (as opposed to some other form of pregnancy termination) is *never* necessary to prevent emotional harm. (*See, e.g.,* Doc. #12 at 24). This argument misses the point. The question is not whether a lack of access to the "partial birth procedure" will itself *cause* emotional harm.[44] Rather, the question is whether a woman who is *already experiencing* a severe risk of irreversible emotional injury must be permitted to undergo the "partial birth procedure," post-viability, because it is safer than the alternatives. Read together, the Sixth Circuit's ruling in *Voinovich* and the Supreme Court's ruling in *Carhart* answer this question. As the Court has explained above, the Sixth Circuit's decision in *Voinovich* establishes that a woman who is at risk of suffering severe mental or emotional harm if she carries her pregnancy to term must be permitted to have an abortion. *Voinovich*, 130 F.3d at 209–210.

43. In *Voinovich*, this Court provided several examples of circumstances in which a serious risk of harm to a woman's mental health may require the termination of her pregnancy. *Voinovich*, 911 F.Supp. at 1078–1081. Upon review, the Sixth Circuit agreed with this Court's conclusion that a woman who is at risk of experiencing severe and irreversible emotional harm if her pregnancy is not terminated must be permitted to do so. *Voinovich*, 130 F.3d at 209–210.

44. In other words, the Court is not suggesting that the banned "partial birth procedure" (as opposed to some other abortion technique) is ever necessary to prevent a woman from experiencing severe and irreversible emotional harm. Rather, the Court is saying that a woman who is already experiencing such emotional harm must be permitted to use the safest procedure available to terminate her pregnancy, including the "partial birth procedure."

45. As the Court explained more fully, *supra*, in its pre-viability analysis, such an exception is required, because the record reveals that the "partial birth procedure" may provide greater safety for some patients. *Carhart*, 120 S.Ct. at 2613.

In addition, *Carhart* teaches that a woman who is entitled to undergo an abortion must be permitted to use the safest procedure available. *Carhart*, 120 S.Ct. at 2609 (recognizing that "a State may promote but not endanger a woman's health when it regulates the methods of abortion").

In light of the foregoing analysis, the Court finds a substantial likelihood that HB 351 is unconstitutional, insofar as it does not permit women with serious, medically diagnosed *mental* health conditions to undergo a "partial birth procedure." Based upon its reading of *Carhart*, the Court concludes that the health exception contained in Ohio Rev.Code § 2919.151(B) must permit women with mental health conditions of the type described in *Voinovich* to select the "partial birth procedure" when it is less risky than other methods of pregnancy termination.[45] Given the Act's failure to do so, the Plaintiffs have demonstrated a substantial likelihood of success with respect to their argument that HB 351 is unconstitutional, insofar as it proscribes the "partial birth procedure" post-viability.[46]

46. Based on the reasoning set forth, *supra*, the Court's analysis of the post-viability health exception in HB 351 may summarized as follows:

1. When a physical health condition makes the "partial birth procedure" necessary, the Act allows said procedure to be performed and, to that extent, it would appear to be constitutional.

2. When a physical health condition makes an abortion necessary (but does not specifically make the "partial birth procedure" necessary), a woman *still* must be permitted to undergo the banned "partial birth procedure" where it is safer than other alternatives. Given that the Act does not provide such an exception, it appears to be unconstitutional in this respect.

3. If a mental health condition ever makes the "partial birth procedure" (as opposed to some other form of pregnancy termination) necessary, the Act would be required to include an exception allowing the banned procedure to be performed. Although the Act does not include such an exception, the Plaintiffs have not established that a mental health condition ever makes the "partial birth procedure" necessary. As this Court recognized in

b. *Adequacy of Scienter Requirement in HB 351*

■ Although the Court has already determined that HB 351 is likely unconstitutional, in the post-viability context, because it appears to lack an adequate health exception, the Court will briefly address one final issue raised by the Plaintiffs. In particular, the Plaintiffs contend that HB 351 is unconstitutional because it lacks a scienter requirement for certain elements of the crime of "partial birth feticide." [47] As set forth above, Ohio Revised Code § 2919.151(D) provides that "[w]hoever violates division (B) or (C) of this section is guilty of partial birth feticide, a felony of the second degree." In turn, Ohio Revised Code § 2919.151(B) and (C) provide:

(B) When the fetus that is the subject of the procedure *is* viable, no person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is not necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

(C) When the fetus that is the subject of the procedure *is not* viable, no person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is not necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

(Emphasis added).

A review of the foregoing provisions reveals that they are nearly identical. The only difference is that division (B) applies when a doctor performs the "partial birth procedure" on a viable fetus, whereas division (C) applies when the procedure is performed on a non-viable fetus. In support of their Motion for a Preliminary Injunction, the Plaintiffs argue, *inter alia*, that the viability, or non-viability, of the fetus is an element of the offense of partial birth feticide under divisions (B) and (C). The Plaintiffs also argue that the two provisions are unconstitutional, because the viability, or non-viability, element has no scienter requirement. In other words, HB 351 imposes strict liability on a physician who performs the "partial birth procedure" on a fetus that either *is* (division B), or *is not* (division C), viable, without respect the physician's knowledge of that fact.

In response, the Defendants argue that HB 351 is constitutional, even though it lacks an express scienter requirement with respect to the viability determination. *First*, they contend that no scienter provision is necessary, because viability, or lack thereof, is not an element of the crime of partial birth feticide. In support of this argument, the Defendants note that the Act proscribes the "partial birth procedure" in exactly the same language both pre- and post-viability. Consequently, they insist that, as a practical matter, the viability issue is irrelevant. *Second*, the Defendants contend that if viability, or non-viability, is an element of the partial birth feticide offense, then the Court may import a scienter standard of "recklessness" into the Act, pursuant to Ohio Rev. Code § 2901.21.

With respect to the first argument, the Court might agree, as a practical matter,

*Voinovich,* a mental health condition certainly may make it necessary to terminate a woman's pregnancy. Based on the evidence before it, however, the Court is unpersuaded that the "partial birth procedure" itself is ever necessary for mental health reasons.

4. Finally, when a mental health condition makes an abortion necessary (but does not specifically make the "partial birth procedure" necessary), a woman *still* must be permitted to undergo the banned "partial birth procedure" where it is safer than other alternatives. Given that the Act does not provide such an exception, it appears to be unconstitutional in this respect.

**47.** The Plaintiffs have briefed the scienter issue as a component of their "vagueness" challenge to the constitutionality of HB 351. (*See* Doc. # 2 at 31–38).

that the viability or non-viability of the fetus is not an element of the offense of partial birth feticide, *if* both division (B) and division (C) of Ohio Revised Code § 2919.151 are constitutional. The fact that HB 351 prohibits exactly the same procedure, with exactly the same exceptions, means that the viability, or non-viability, issue is of no real significance.[48] The Defendants' first argument fails, however, given the substantial likelihood that division (C) of Ohio Revised Code § 2919.151 is unconstitutional. Absent that provision, the viability of the fetus is critical, because § 2919.151(B) only prohibits performance of the "partial birth procedure" when a fetus is viable. Consequently, if the Plaintiffs prevail on their challenge to the constitutionality of division (C), which the Court has found likely, then viability will be an element of the offense of partial birth feticide under division (B).

In light of the foregoing reasoning, the Court next must determine the impact of its finding that viability will be an element of division (B), if division (C) is unconstitutional. As an initial matter, the language of § 2919.151(B) makes clear that the viability element has no express *mens rea* requirement, and the Defendants do not argue otherwise. In other words, with respect to the viability determination, the language of the Act imposes strict liability for a violation of division (B), once division

(C) is removed as unconstitutional.[49] Under the language of the Act, a physician will be liable if he performs a "partial birth procedure" on a viable fetus, despite his good faith, but erroneous, clinical judgment that the fetus was not viable.

A review of pertinent case law persuades the Court that the State of Ohio may not impose strict liability with respect to the determination of viability. "Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime." *United States v. Bailey,* 444 U.S. 394, 403, 100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980). However, "[w]hen considering the constitutionality of statutes regulating abortion, strict liability concerns are raised by laws that lack the element of intent, which is so necessary to protect physicians who perform abortions reasonably and in good faith from civil and criminal liability."[50] *Okpalobi v. Foster,* 190 F.3d 337, 359 (5th Cir.1999), *rehearing en banc granted,* 201 F.3d 353 (2000). This is so because "strict liability chills the inclination of physicians to provide abortions[,]" thereby eroding the ability of women to undergo those procedures. *Id.* at 360.[51]

With respect to strict liability and the existence of viability, the Supreme Court has recognized:

[t]he perils of strict criminal liability are particularly acute here because of the

---

**48.** A prosecutor presumably could charge a physician in the alternative, thereby rendering the viability of the fetus meaningless as a practical matter.

**49.** As the Court will explain more fully, *infra,* however, it is not clear that the Ohio General Assembly *intended* to impose strict liability with respect to the viability determination.

**50.** The concept of "strict liability" "encompasses legal consequences that flow from an act regardless of the total absence of wrongful intent on the part of the actor." *Okpalobi,* 190 F.3d at 359.

**51.** *See also Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1466–1467 (8th Cir.1995) ("A physician who performs an abortion on a minor who he reasonably be-

lieves is more than eighteen years old is strictly liable for his conduct, as is a physician who in good faith supplies the mandatory information over the phone to the wrong person. The potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota."); *Summit Medical Assocs., P.C., v. James,* 984 F.Supp. 1404, 1447 (M.D.Ala.1998) (holding that "where, as here, the specter of medical expert disagreement conjoins with a statute imposing strict criminal and civil liability for an erroneous medical determination, the result could very well be 'a profound chilling effect on the willingness of physicians to perform abortions' ... in the manner indicated by their best medical judgment") (quotations omitted), *rev'd in part on other grounds,* 180 F.3d 1326 (1999).

uncertainty of the viability determination itself. . . . [E]ven if agreement may be reached on the probability of survival, different physicians equate viability with different probabilities of survival, and some physicians refuse to equate viability with any numerical probability at all. In the face of these uncertainties, it is not unlikely that experts will disagree over whether a particular fetus in the second trimester has advanced to the stage of viability. The prospect of such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination of viability, could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.

*Colautti v. Franklin,* 439 U.S. 379, 395–396, 99 S.Ct. 675, 58 L.Ed.2d 596. (1979) (footnotes omitted); *see also Voinovich,* 130 F.3d at 205 ("[W]e find *Colautti* strongly indicative of the Court's view that in [the abortion context], scienter requirements are particularly important. The determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others."); *American College of Obstetricians and Gynecologists v. Thornburgh,* 737 F.2d 283, 298 (3rd Cir.1984), *aff'd* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) ("[B]ecause of the uncertainty of the viability determination itself, a statute that imposes strict criminal and civil liability upon a physician for performing or inducing an abortion after viability may create a profound chilling effect on the willingness of physicians to perform abortions near the point of viability.").

Based upon the foregoing authorities, the Court concludes that HB 351 cannot impose strict liability, with respect to a physician's determination of viability. As noted, *supra,* the term "viable," as used in HB 351, "means the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(1)(c)(ii). After reviewing the foregoing language, the Court concludes that reasonable physicians may well disagree over whether a particular fetus is, or is not, viable, given the inherent ambiguity in the phrase "realistic possibility of maintaining a life outside the womb with or without temporary artificial life-sustaining support." If nothing else, the words "realistic possibility" certainly may have different meanings to different individuals. As a result, the Court concludes that the Ohio legislature may not impose strict liability with respect to the existence of viability. Rather, " 'the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.' " *Webster v. Reproductive Health Services,* 492 U.S. 490, 516–517, 109 S.Ct. 3040, 3056, 106 L.Ed.2d 410 (1989); *see also Colautti,* 439 U.S. at 395, 99 S.Ct. 675 ("Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more than 'a trap for those who act in good faith.' ").

In opposition to the Plaintiffs' contention that HB 351 is unconstitutional, given that it lacks a scienter requirement regarding the viability determination, the Defendants insist that Ohio Revised Code § 2901.21 fills the void and saves the Act. (Doc. # 12 at 16). In relevant part, § 2901.21 provides:

When the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in such section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose

strict liability, recklessness is sufficient culpability to commit the offense.

Ohio Rev.Code § 2901.21(B).

Relying upon the foregoing language, the Defendants urge the Court to import a recklessness standard into the determination of viability required by HB 351. In resolving this issue, the Court will "proceed from the fundamental precept that Ohio statutes are entitled to a strong presumption of constitutionality and must, in questionable cases, be construed to be constitutional if possible." *Board of County Commissioners of Ottawa County v. Village of Marblehead*, 86 Ohio St.3d 43, 46, 711 N.E.2d 663, 666 (1999). With this principle in mind, and *solely* for purposes of this preliminary injunction ruling, the Court will indulge the Defendants in their argument that Ohio Revised Code § 2919.151(B) is capable of being construed in such a manner that a recklessness standard may be imported into the Act, with respect to a physician's determination whether a fetus is viable.

The Court simply cannot conclude, after reviewing the language of HB 351, that the Ohio legislature has "plainly indicated" its intent to impose strict liability for a physician's erroneous determination of viability. Rather, given the structure of the Act, it appears more likely that the legislature never considered the issue at all. As noted above, the Act prohibits the same "partial birth procedure," with exactly the same exceptions, regardless of the viability of the fetus. Ohio Rev.Code § 2919.151(B) and (C). Consequently, a persuasive argument can be made that the legislature never thought the viability, or non-viability, of the fetus to be material. That issue is significant now only because the Court has found a substantial likelihood that division (C), which applies pre-viability, is unconstitutional. Given that Ohio statutes are entitled to a strong presumption of constitutionality, and absent a plain indication of an intent to impose strict liability, the Court finds, for purposes of its analysis on the issues presented at this preliminary phase of this litigation, that Ohio's courts would import a recklessness standard into the viability determination required by HB 351.

In the foregoing analysis, the Court has considered the scienter issue with respect to a physician's determination that a fetus is *viable*. The Court will now discuss the scienter issue in a different context. Specifically, the Court will address the Plaintiffs' argument that the *health exception* in HB 351 lacks a necessary scienter requirement.[52] As noted above, the Act states:

> ... [N]o person shall *knowingly perform a partial birth procedure* on a pregnant woman *when the procedure is not necessary, in reasonable medical judgment,* to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

Ohio Revised Code § 2919.151(B) and (C).

In support of their Motion for a Preliminary Injunction, the Plaintiffs argue that the term "knowingly" modifies only the phrase "perform a partial birth procedure." Relying upon that interpretation, they insist that the medical necessity determination is a strict liability element, meaning that a physician could be convicted of partial birth feticide despite having a good faith, but erroneous, belief that the "partial birth procedure" was necessary. In response, the Defendants do not argue that the term "knowingly" modifies (1) the performance of the procedure and (2) the existence of medical necessity. (Doc. # 12 at 14).[53] Rather, the Defendants argue

---

**52.** This issue requires its own analysis, because the viability determination and the health exception are set forth as separate elements in HB 351.

**53.** Given that the Defendants have not asked the Court to construe the term "knowingly" as applying to both the performance of the procedure *and* the existence of medical necessity, the Court will not decide *sua sponte*, in the context of the present Motion for a Preliminary Injunction, whether such a construction of the Act would be reasonable.

that the Court may import a recklessness standard with respect to a physician's determination that a medical necessity exists. (*Id.*).

After reviewing the language of HB 351, the Court finds that the Ohio legislature has not "plainly indicated" its intent to impose strict liability for a physician's erroneous determination of medical necessity. In reaching this conclusion, the Court pauses briefly to note that the Ohio Supreme Court has not applied a consistent analytical framework to decide whether a criminal statute creates a strict liability offense, or whether recklessness may be imported as the requisite mental state, pursuant to § 2901.21(B). For instance, in *State v. Collins*, 89 Ohio St.3d 524, 733 N.E.2d 1118 (2000), that court rejected an argument that public policy and legislative intent were sufficient to establish that Ohio Revised Code § 2919.21(B), which criminalizes the failure to make child support payments, was a strict liability offense, writing:

> We acknowledge the convincing public policy arguments presented by the state and amicus Ohio Prosecuting Attorneys' Association in support of the proposition that failure to follow a court-ordered child support order should be a strict liability offense. However, the General Assembly itself has established the test for determining strict criminal liability in R.C. 2901.21(B). That statute provides that where a statute defining a criminal offense fails to expressly specify a mental culpability element, *e.g.*, negligence, recklessness, or intentional conduct, proof of a violation of the criminal provision requires a showing of recklessness, absent a plain indication in the statute of a legislative purpose to impose strict criminal liability. R.C. 2901.21(B). It is not enough that the General Assembly in fact intended imposition of liability without proof of mental culpability. Rather the General Assembly must plainly indicate that intention in the language of the statute. There are no words in R.C. 2919.21(B) that do so.

*Id.* at 529–30, 733 N.E.2d at 1123–24. Therein, the Ohio Supreme Court did not discuss *State v. Schlosser*, 79 Ohio St.3d 329, 681 N.E.2d 911 (1997), which it had decided only three years earlier. In *Schlosser*, that court did examine legislative intent and public policy considerations, rather than merely the language of the statute, to conclude that the Ohio General Assembly had intended a particular statute to impose strict, criminal liability. Finally, in *State v. Wharf*, 86 Ohio St.3d 375, 715 N.E.2d 172 (1999), the Ohio Supreme Court addressed the issue of whether robbery was, in part, a strict liability offense. Robbery is defined by Ohio Revised Code § 2911.02(A)(1), which provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall ... [h]ave a deadly weapon on or about the offender's person or under the offender's control...." In *Wharf*, the court focused upon the element that required a defendant to have a deadly weapon on or about his person or under his control. The *Wharf* court declined to import a recklessness requirement to that element, under § 2901.21(B), concluding that the legislature had intended to impose strict liability, with respect to that element, because, *inter alia*, the statute did not require that the offender have physical possession of the weapon, or that the weapon be used or displayed. In addition, the Ohio Supreme Court indicated that the legislature had wanted to prevent the harm that could be caused when individuals commit theft offenses with weapons in their custody or control—an intent that was furthered by making the offense a strict liability crime.

The Court has cited the foregoing examples merely to illustrate its point that Ohio's appellate courts have been inconsistent with respect to their importation of recklessness as the requisite mental state in a given statute. At times, Ohio's courts have relied solely upon the language of the statute at issue, as § 2901.21 suggests that they must. Other times, however, they have cited public policy considerations or

legislative intent as a basis for importing, or not importing, a recklessness standard. In any event, the Plaintiffs have not identified anything in the language of Ohio Revised Code § 2919.151(B) or its legislative history to persuade the Court that the Ohio General Assembly plainly intended to impose strict liability with respect to a physician's medical necessity determination. Nor have the Plaintiffs articulated any public policy argument to support such a reading of the Act, even if public policy is a permissible consideration. Rather, the Plaintiffs argue only that such a reading of the medical necessity exception is compelled by this Court's ruling in *Voinovich*, 911 F.Supp. at 1085–1087.

Upon review, the Court finds the Defendants argument to be unpersuasive. In *Voinovich*, the Court declined to import a "recklessness" standard into a strict liability provision of HB 135, in part because other portions of that legislation already included a culpable mental state. After noting that fact, the Court reasoned as follows:

> ... [I]t is significant that although the post-viability ban and the viability testing requirement lack scienter requirements, the ban on use of the D & X procedure does contain a scienter requirement. Ohio courts have held if portions of a statute specify a culpable mental state, whereas other portions of the statute are silent as to the culpable mental state, this is a plain indication of an intent to impose strict liability in the latter sections or portions. *State v. Wac*, 68 Ohio St.2d 84, 87, 428 N.E.2d 428 (1981); *City of Brecksville v. Marchetti*, 1995 WL 693091, 1995 Ohio App. LEXIS 5164 (Ohio App.1995). Based on the foregoing, this Court finds that the ban on post-viability abortions, and the viability testing requirement, "plainly indicate" an intention to create strict liability.

*Voinovich*, 911 F.Supp. at 1086.

The present case differs from *Voinovich* and the cases cited therein. In *Voinovich*, the Court noted that one section of HB 135 (the pre-viability ban on the D & X procedure) included a scienter requirement, whereas other sections of the legislation (the post-viability ban on all abortions and the viability testing requirement) failed to include such a requirement. As a result, the Court inferred an intent on the part of the legislature to impose strict liability with respect to the latter provisions. Such reasoning is consistent with *State v. Wac*, 68 Ohio St.2d 84, 87, 428 N.E.2d 428 (1981). In *Wac*, the Ohio Supreme Court reviewed a criminal statute that prohibited two separate offenses, bookmaking and facilitating bookmaking. In relevant part, the statute provided that "[n]o person shall ... [e]ngage in bookmaking, or knowingly engage in conduct that facilitates bookmaking." *Id.* at 431. Reviewing this language, the Ohio Supreme Court reasoned:

> The General Assembly included the culpable mental state of "knowingly" as an element of *facilitating* bookmaking. Nevertheless, there is no such requirement in the same subsection for bookmaking *per se*. This exclusion "plainly indicates a purpose to impose strict criminal liability * * *."

*Id.*

In the present case, however, the Court is not comparing two distinct criminal offenses (as in *Wac* ), or separate statutory provisions (as in *Voinovich* ), some of which include *mens rea* requirements and some of which do not. Rather, the Court is considering whether it may import a recklessness standard into the "medical necessity" *element* of *one* statutory section. Recent Ohio law establishes that a court *may* import a recklessness standard into a *particular element* of an offense, pursuant to § 2901.21(B), even if other elements of that offense specify a culpable mental state. *See, e.g., State v. Wharf*, 86 Ohio St.3d 375, 715 N.E.2d 172 (1999); *State v. Maxwell*, Franklin County App. No. 99AP–1177, 2000 WL 1289447 (10th Dist. Sept. 14, 2000). In other words, the fact that one element of an offense expressly indicates a scienter requirement

*does not* preclude the importation of a recklessness standard for other elements as to which the statute is silent regarding a culpable mental state.[54] *Id.*

Finally, the Court finds its ruling in *Voinovich* to be distinguishable in a second respect. In *Voinovich,* the Court reviewed the "medical emergency" exception contained in HB 135. That exception was defined, in relevant part, as follows:

"Medical emergency" means a condition that *a pregnant woman's physician determines, in good faith and in the exercise of reasonable medical judgment,* so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion....

*Voinovich,* 911 F.Supp. at 1082 (emphasis added).

At issue in *Voinovich* was whether the Court could import a recklessness standard with respect to a physician's determination that a "medical emergency" existed. The Court concluded that it could not, reasoning:

... [T]he statute's standard of "reasonableness," which imposes criminal liability if a physician acts unreasonably in determining that a medical emergency exists, is a lower standard for incur-

ring criminal liability, from the perspective of the actor, than the standard of "recklessness." If courts were to import a recklessness requirement into the medical emergency definition per the above-quoted section 2901.21(B), physicians would no longer be liable if they acted unreasonably, i.e., negligently; instead, they would have to act recklessly in order to be liable. This would contradict the legislature's intent to create liability if a physician fails to act "in the exercise of reasonable medical judgment," and would amount to rewriting the statute, which courts may not do. Therefore, this Court concludes that a scienter requirement may not be imported into the definition of medical emergency.

*Id.* at 1086 (footnotes omitted).

In short, the Court determined in *Voinovich* that it would be inappropriate to import a recklessness requirement into HB 135, given that the statute expressly made a physician liable if he acted negligently. In the present case, however, HB 351 is worded differently. In relevant part, it provides:

... [N]o person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is

---

**54.** Parenthetically, the Court notes that Ohio Revised Code § 2901.21 reasonably could be interpreted as allowing importation of a recklessness standard only when a statute defining a criminal offense is completely silent regarding the applicable culpability standard. In other words, the Court believes that § 2901.21 could be read as not applying if *any* element of an offense contains a *mens rea* requirement. Section 2901.21 provides:

(A) Except as provided in division (B) of this section, a person is not guilty of an offense unless both of the following apply: (1) His liability is based on conduct which includes either a voluntary act, or an omission to perform an act or duty which he is capable of performing; (2) *He has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense.* (B) *When the section defining an offense does not specify any degree of culpability,*

*and plainly indicates a purpose to impose strict criminal liability for the conduct described in such section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense.*

Ohio Rev.Code § 2901.21 (emphasis added).

In the Court's view, the emphasized portions of the statute reasonably could be interpreted to mean that importation of a recklessness standard is permitted *only* when the statutory section defining an offense is *completely silent* regarding the degree of culpability required for conviction. Such a reading, however, would be inconsistent with the Ohio case law set forth above. *See State v. Wharf,* 86 Ohio St.3d 375, 715 N.E.2d 172 (1999); *State v. Maxwell,* Franklin County App. No. 99AP–1177, 2000 WL 1289447 (10th Dist. Sept. 14, 2000). Therefore, the Court will not indulge in such a reading of § 2901.21.

not necessary, in reasonable medical judgment, to preserve the life or health of the mother....

Ohio Rev.Code § 2919.151(B) and (C).

Notably, HB 351 does not address the provider's mental state with respect to the medical necessity determination. Rather, that statute establishes certain factual circumstances under which performance of the partial birth procedure is criminal (*i.e.*, when the procedure is not necessary in reasonable medical judgment to preserve the life or health of the mother). Consequently, the Court would not be required to "rewrite" the Act in order to import a recklessness standard with respect to a physician's medical emergency determination.

Based on the foregoing, the Court finds that the Plaintiffs have not shown a substantial likelihood of demonstrating that HB 351 is unconstitutional on the basis that it lacks adequate scienter standards. Nevertheless, for the *other* reasons set forth more fully, *supra*, the Court *does* find a substantial likelihood that the Act's pre-viability and post-viability ban on the "partial birth procedure" is unconstitutional.

## II. *Irreparable Harm or Injury*

■■■ Having addressed the likelihood of the Plaintiffs' success on the merits, the Court now turns to the remaining prongs governing the issuance of a preliminary injunction. The second prong of the preliminary injunction standard requires the Court to determine whether an injunction is necessary to prevent irreparable harm or injury. Upon review, the Court concludes that a preliminary injunction *is* necessary to prevent irreparable harm or injury to Plaintiff Haskell and Ohio women seeking abortion services. As noted, *supra*, Plaintiff Haskell has brought the present action on behalf of himself and the pregnant women who visit his clinic. Without a preliminary injunction, physicians such as Plaintiff Haskell would face the possibility of criminal prosecution and civil liability which may effectively chill

their practice of medicine to such an extent that would rely on methods of abortion that are riskier to their patients. In *Voinovich*, this Court recognized that "[p]regnant women in this state who are unable to terminate their pregnancies by means of the D & X procedure may therefore suffer irreparable harm ... because other abortion methods are not as safe for their health...." *Voinovich*, 911 F.Supp. at 1092. The foregoing conclusion is equally applicable in the present case, insofar as HB 351 bans the "partial birth procedure." Based on the reasoning set forth above, the Court finds that the banned procedure may be safer than any other alternative, particularly for women seeking second-trimester abortions. As a result, the issuance of a preliminary injunction will prevent irreparable harm to those women. Finally, the Court notes that, in the context of abortion regulations, the impairment of a constitutional right alone is sufficient to constitute irreparable harm. *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1396–1400 (6th Cir.1987) (finding issuance of a preliminary injunction appropriate where an ordinance unconstitutionally interferes with a woman's decision to have an abortion).

## III. *Harm to Others ("Balancing of Equities")*

The third prong of the preliminary injunction standard requires the Court to "balance the equities." Stated differently, the Court must determine whether the harm to the Defendants if an injunction is granted outweighs the harm to the Plaintiffs if an injunction is denied. With respect to the Defendants' interests, the Court finds that a preliminary injunction simply will maintain the status quo while the constitutionality of HB 351 is decided. On the other hand, Plaintiff Haskell faces the prospect of subjecting himself to civil and criminal liability if he performs the banned "partial birth procedure." Furthermore, as noted, *supra*, women undergoing abortions may face greater health risks if physicians comply with HB 351 and

forego performing the "partial birth procedure." In light of these considerations, the Court finds that the equities involved favor the entry of a preliminary injunction.

## IV. *Public Interest*

The final prong of the preliminary injunction standard requires the Court to determine whether the issuance of an injunction will serve the public interest. Upon review, the Court concludes that the public interest will be served by a full and fair hearing on the merits of the constitutionality of HB 351. This is particularly true, given that the Plaintiffs have demonstrated a substantial likelihood of success on their argument that the Act is unconstitutional on its face, insofar as it bans the "partial birth procedure," both pre-viability and post-viability. Accordingly, the Court finds that the public interest will be served by the issuance of a preliminary injunction. *Cf. Planned Parenthood Ass'n,* 822 F.2d at 1400 (recognizing that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional").

## V. *Conclusion*

To summarize, the Court has held that all four prongs of the preliminary injunction standard weigh in favor of granting a preliminary injunction and enjoining the Defendants from enforcing HB 351. With respect to the Plaintiffs' likelihood of success on the merits, the Court will briefly summarize its conclusions of law as follows:

(1) The Plaintiffs *have not* demonstrated a substantial likelihood that, in the pre-viability context, HB 351 imposes an undue burden on a pregnant woman's right to have an abortion by banning the D & E procedure.

(2) The Plaintiffs *have* demonstrated a substantial likelihood that, in the pre-viability context, HB 351 is unconstitutional, because it lacks an adequate exception for the health of the woman. In particular, the Court finds a substantial likelihood that the Act is unconstitutional, because does not allow the "partial birth procedure" to be performed when said procedure is safer than other methods of terminating a pregnancy.

(3) The Plaintiffs *have* demonstrated a substantial likelihood that, in the post-viability context, HB 351 is unconstitutional, because it lacks an adequate exception for the health of the woman. In particular, the Court finds a substantial likelihood that the Act is unconstitutional for two reasons. *First,* HB 351 does not contain a provision allowing a woman to undergo the "partial birth procedure," post-viability, when she has a serious *physical* health problem and the banned procedure, while not absolutely necessary, is the safest method of terminating her pregnancy. *Second,* HB 351 does not permit a woman with a serious *mental* health condition to undergo the "partial birth procedure," post-viability, when said procedure, while not absolutely necessary, is the safest method of terminating her pregnancy.

(4) The Plaintiffs *have not* demonstrated a substantial likelihood of prevailing on their argument that HB 351 is unconstitutionally vague or that it lacks adequate scienter requirements.

Based on the reasoning and citation of authority set forth above, the Plaintiffs' Motion for a Preliminary Injunction (Doc. # 2) is hereby sustained. The Defendants, their employees, agents and servants are preliminarily enjoined from enforcing any provision of Substitute House Bill 351.[55]

---

**55.** In entering a preliminary injunction, the Court pauses briefly to note that it has not addressed every argument raised by the parties in their respective memoranda. The Court assures the parties, however, that is has given serious consideration to every argument that they have presented. The Court has simply found it unnecessary, at the preliminary injunction stage, to address the merits of ev-

ery dispute, given that the Plaintiffs have demonstrated a substantial likelihood of success on their challenge to the constitutionality of HB 351 for the reasons set forth herein.

The Court wishes to note, however, that it has considered, *inter alia,* the Defendants' argument that the State of Ohio has a strong interest in preventing the unnecessary death

706

Having considered the issue of bond, as is required by Fed.R.Civ.P. 65, the Court concludes that no bond will be required of the Plaintiffs.

Counsel of record will take note that a brief telephone conference will be held, between the Court and counsel, at 5:00 p.m. on Thursday, September 28, 2000, to establish further procedures to be followed in this litigation. In particular, counsel should be prepared to discuss whether they wish to proceed to trial upon the merits of the captioned cause in late 2000, or whether, in the alternative, the Defendants wish to take an immediate appeal of this decision to the Sixth Circuit Court of Appeals, either from the Court's entry of the preliminary injunction or with the Court entering final judgment based upon the findings of fact and conclusions of law set forth herein.

of a fetus when it is substantially outside the body of the mother, and in preventing unnecessary cruelty to a fetus, regardless of whether the fetus has a "conscious" perception of pain. The Court also has considered the Defendants' argument that the State of Ohio has an interest in maintaining a strong public policy against infanticide. For purposes of its analysis herein, the Court has presumed the legitimacy of these asserted State interests.

Finally, the Court has found it unnecessary, at this time, to determine the constitutionality of the civil liability provision contained in HB 351. The relevant provision permits a woman upon whom a "partial birth procedure" is performed to bring a civil action for compensatory and punitive damages against the doctor who performed the procedure. Ohio Rev. Code § 2307.53(B). The same provision also permits a civil action to be brought by the father of the aborted fetus, or by a parent of a woman upon whom a "partial birth procedure" is performed, provided that she is a minor. Given that the Court has enjoined the State of Ohio from enforcing its ban on the "partial birth procedure," the predicate for a civil action (i.e., a physician's violation of the ban on the partial birth procedure) seemingly no longer exists. Indeed, it is incongruous to suggest that a private party may prevail in a tort action against a physician who performs a *legal* partial birth abortion. In any event, the Court has serious questions about its ability to issue an injunction, directed toward the State Defendants, that binds unidentified, and non-party, private individuals for whom § 2307.53(B) provides a civil cause of action. *See, e.g., Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326, 1342 (11th Cir.1999). The Court discerns no purpose in "enjoining" the Defendants from pursuing a civil action under a statute that does not provide *them* with such a cause of action. Furthermore, such a ruling would not appear to impact those unidentified, private individuals who may possess a civil cause of action, given that they are not parties to this litigation.